**COMMONWEALTH of Pennsylvania**
**Appellee**

v.

**Darrell KIMBROUGH, Appellant.**

Superior Court of Pennsylvania.

Argued May 25, 2004.

Filed April 19, 2005.

Gerard E. Grealish, Scranton, for appellant.

Eugene M. Talerico, Assistant District Attorney, Scranton, for Commonwealth, appellee.

Before: HUDOCK, JOYCE, MUSMANNO, KLEIN, BENDER, BOWES, GANTMAN, McCAFFERY, and PANELLA, JJ.

PANELLA, J.:

¶ 1 Appellant, Darrell Kimbrough ("Kimbrough"), appeals from the judgment of sentence entered on September 27, 2000, by the Honorable Carmen D. Minora, Court of Common Pleas of Lackawanna County, following a jury trial wherein Kimbrough was found guilty of third-degree murder, 18 PA. CONS. STAT. ANN. § 2502(c), and voluntary manslaughter, 18 PA. CONS. STAT. ANN. § 2503(a)(1), under accomplice theories.[1] At trial, Kim-

---

1. Thereafter, Kimbrough was sentenced to a period of incarceration of twenty (20) to forty (40) years on the third-degree murder charge followed by consecutive terms of ten (10) months to twenty-four (24) months on each of the reckless endangerment charges; resulting in a total sentence of twenty-one years and eight months (260 months) to forty-four years (528 months). N.T., 09/27/00 at 34–35.

brough and his half-brother, Fredrick Campfield, as well as Kimbrough's employee, Jack Morris, were implicated in the shooting death of Derrick Walker.[2] Kimbrough was also found guilty of two counts of recklessly endangering another person[3] in relation to two other victims, Anthony Toosen and Nikia Hogan, who were nonfatally wounded. After careful review, we affirm.

¶ 2 The trial court provided a comprehensive opinion pursuant to Pa.R.A.P., Rule 1925(a), 42 PA. CONS. STAT. ANN. The factual history can be summarized as follows.

¶ 3 In the evening hours of June 12, 1997, Kimbrough and the victim were involved in an argument at the Broadway Bar in Scranton. The victim was eventually joined at the bar by his brother, Dennis Walker. Although the two brothers spoke about the argument that Derrick had had with Kimbrough, Derrick felt that the confrontation was over and, regrettably, decided to stay at the bar.

¶ 4 Later in the evening, Frederick Campfield, the convicted shooter, asked Jack Morris for a ride. After initially ignoring Campfield's request, Morris ended up driving Campfield to Skyview Apartments, but only after he was told to do so by Kimbrough. Consequently, Campfield and Morris went to the apartment complex; Campfield ran inside, stayed only a few minutes, and then ran out again. As they drove away, Campfield gave Morris a gun he had retrieved from the apartment and told him to carry it into the bar.

¶ 5 When Morris walked into the bar, Kimbrough asked him if he had his "jimmie" [gun] which prompted Morris into giving the gun to Kimbrough in the rest-

room. Kimbrough then took several steps which facilitated the shooting which was to occur shortly thereafter: he cocked the gun, chambering a round; exited the restroom; made threatening statements while waiving the gun around, such as "does anyone want to mess with me now"; and talked of "shooting the place up."

¶ 6 The open display of the gun, combined with the menacing statements, understandably caused many of the bar patrons to flee. At about the same time, Kimbrough engaged in a heated argument with Dennis Walker. Although they argued about Derrick Walker, Kimbrough made numerous threatening statements directed against Dennis, and pointed the gun at Dennis. Unwisely, Dennis did not back down, and the two men continued to scream at each other. Kimbrough pointed the gun directly at Dennis Walker and said "I'll kill you." Kimbrough went on to say that he could have someone else shoot up the place and that he did not have to do it himself. At the same time, Campfield kept saying, "Let me show you. Let me show you. Let me show you."

¶ 7 Raquel Waiters, who was unfortunately a patron of the bar that night, responsibly pushed Kimbrough's arm down so that the gun was no longer pointed at Dennis Walker. But the danger did not end that easily. The resulting events unfolded quickly.

¶ 8 Dennis' two brothers, Robert Walker and Derrick Walker, pulled Dennis out of the bar. In fact, everyone in the bar seemed to be moving outside. Kimbrough appeared to have either stuck the gun in the rear of his pants or held it behind his back, depending upon the perception of the

---

**2.** Kimbrough was tried jointly with co-defendant, Campfield. Campfield's conviction of first-degree murder was affirmed at 844 A.2d 1276 (Pa.Super.2003) (Table). The third co-defendant, Morris, pled guilty to third-degree murder as an accomplice. N.T., 06/15/2000, at 336.

**3.** 18 PA. CONS. STAT. ANN. § 2705.

witnesses that night. Campfield grabbed the gun from Kimbrough, stepped into the street, and pointed the gun at a departing automobile. While saying words to the effect that he was going to show everyone "how it's done", he discharged the gun into the car. The trial court concisely summarized the similar, yet slightly different, versions of the shooting:

> Dennis Walker, the victim's brother, said Campfield ran from behind Kimbrough and grabbed the gun. Campfield said, "I'm going to show you how it's done, son," and went out into the middle of the street, immediately raised the gun, and started shooting at a departing automobile containing the victim.
>
> Jack Morris stated under oath that Campfield grabbed the gun out of Kimbrough's back as Defendant Campfield was walking outside the bar. Campfield said he was going to show everybody how it's done. He pointed the gun at a white car and started firing.
>
> Jamal Morrison said the Defendant Kimbrough then took the gun out of his pants and Campfield snatched it out of his hands. Then Campfield said "I'm going to show you how it's done, let me do it, let me do it, let me do it, let me do it." Campfield "grabbed it, tussled for it," and stepped out on the street and started firing.
>
> Raquel Waiters said Campfield grabbed the gun and said, "Let me see, I'm going to show you, I'm going to show you, I'm going to show you" and ran into the middle of the road and started shooting at a car while Defendant Kimbrough remained standing in the doorway. Subsequently, Waiters testified that she did not know how Campfield got the gun. Waiters then stated that after the shooting, Defendant Kimbrough said of Defendant Campfield, the alleged shooter: "that's my man."

Trial Court Opinion Sur Pa.R.A.P.1925(A), 10/16/02, at pp. 5–6.

¶ 9 Several shots were fired into the vehicle. Derrick Walker was in the back seat, and was tragically killed by a single bullet to the back of his head. Anthony Tooson was the driver of the vehicle, and Nikia Hogan was in the passenger seat.

¶ 10 Kimbrough's first issue on appeal is whether the Commonwealth presented sufficient evidence to sustain the convictions of third degree murder, voluntary manslaughter and reckless endangering. Specifically, Kimbrough argues that the evidence was insufficient to demonstrate that he possessed the requisite intent to sustain his conviction as an accomplice to the shooting.

¶ 11 In determining sufficiency of the evidence, we review the evidence admitted at trial, along with any reasonable inferences that may be drawn from that evidence, in the light most favorable to the verdict winner. *Commonwealth v. Rivera*, 565 Pa. 289, 295, 773 A.2d 131, 135 (2001); *Commonwealth v. Bullick*, 830 A.2d 998, 1000 (Pa.Super.2003). A conviction will be upheld if after review we find that the jury could have found every element of the crime beyond a reasonable doubt. *Bullick*, 830 A.2d at 1000. We may not weigh the evidence or substitute our judgment for that of the fact-finder. *Commonwealth v. DiStefano*, 782 A.2d 574, 582 (Pa.Super.2001), *appeal denied*, 569 Pa. 716, 806 A.2d 858 (2002). The facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. *Commonwealth v. Reaser*, 851 A.2d 144, 147 (Pa.Super.2004). "Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances." *Commonwealth v. Sheppard*,

837 A.2d 555, 557 (Pa.Super.2003)(citing *Commonwealth v. Cassidy,* 447 Pa.Super. 192, 668 A.2d 1143, 1144 (1995)). The Commonwealth may prove each element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. *DiStefano,* 782 A.2d at 582. Furthermore, the entire record must be evaluated and all evidence actually received must be considered. *Id.* Finally, the trier of fact, while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part, or none of the evidence. *Commonwealth v. Dougherty,* —— Pa. ——, 860 A.2d 31, 36 (2004).

¶ 12 As stated previously, Kimbrough was found guilty of third degree murder and voluntary manslaughter under an accomplice theory of liability for the shooting death of Derrick Walker. The Pennsylvania Crimes Code sets forth accomplice liability as follows:

> (a) General Rule—A person is guilty of an offense if it is committed by his own conduct or by the conduct of another person for which he is legally accountable, or both.
> (b) Conduct of Another—A person is legally accountable for the conduct of another when:
>
> . . . . .
>
> (3) he is an accomplice of such other person in the commission of the offense.
> (c) Accomplice Defined—A person is an accomplice of another person in the commission of an offense if:
> (1) with intent of promoting or facilitating the commission of the offense, he:
> (i) solicits such other person to commit it; or
> (ii) aids or agrees or attempts to aid such other person in planning or committing it.

18 PA. CONS. STAT. ANN. § 306.

■■■ ¶ 13 To find Kimbrough guilty as an accomplice, a two-prong test must be satisfied. *Commonwealth v. Murphy,* 577 Pa. 275, 284, 844 A.2d 1228, 1234 (2004). First, there must be evidence to show that Kimbrough intended to facilitate or promote the underlying offense. *Id.* Second, there must be evidence that Kimbrough actively participated in the crime or crimes by soliciting, aiding, or agreeing to aid the principal, in this case, Frederick Campfield. *Id.* Both requirements may be established wholly by circumstantial evidence. *Id.* Only "[t]he least degree of concert or collusion in the commission of the offense is sufficient to sustain a finding of responsibility as an accomplice." *Commonwealth v. Coccioletti,* 493 Pa. 103, 109, 425 A.2d 387, 390 (1981). No agreement is required, only aid. *Commonwealth v. Graves,* 316 Pa.Super. 484, 463 A.2d 467, 470 (1983).

■■■ ¶ 14 We review Kimbrough's actions that evening in the light most favorable to the Commonwealth as the verdict winner and find that the evidence was sufficient to sustain Kimbrough's conviction as an accomplice of Campfield in the shooting death of Derrick Walker. Kimbrough's actions on that evening began with an argument with the victim. N.T., 06/13/2000, at 200. After a conversation with Campfield, Kimbrough's half-brother, Kimbrough told Morris to drive Campfield to Kimbrough's apartment for the express purpose of retrieving a loaded gun. N.T., 06/15/2000, at 301. Campfield retrieved the gun, gave it to Morris, who furtively gave it to Kimbrough in the men's room of the Broadway Bar. *Id.* at 309, 463 A.2d 467.

¶ 15 Kimbrough cocked the gun making it ready to fire a live round. *Id.* Kimbrough then brandished the weapon about the bar, threatening the patrons and telling Dennis Walker, the victim's brother, he was going to kill him. N.T., 06/13/2000, at 203; 06/15/2000, at 310–311. He boasted

to all within earshot that he could get someone else to blow up the place. N.T., 06/13/2000 at 193. When Kimbrough left the bar he held the gun in such a position, and still in a cocked, ready-to-fire state, on his person so that it was easily and quickly taken from him by his half-brother, Campfield. N.T., 06/15/2000 at 14.

¶ 16 From this sequence of events the jury could have reasonably inferred that Kimbrough was acting with the intent of promoting or facilitating the eventual use of the gun. "To promote" has been defined as "to contribute to the progress or growth of." WEBSTER'S II NEW COLLEGE DICTIONARY 885 (1995). "To facilitate" has been defined as "to make the commission of a crime easier" or to make it easier for another person to commit a crime. BLACK'S LAW DICTIONARY 610 (7th Ed.1999). The evidence established that Kimbrough aided Campfield in the acquisition of the gun and set the stage for the shooting with his words and actions.

¶ 17 The jury also had sufficient evidence to find the second prong as Kimbrough was not only involved in the initial procurement of the gun, but also the transfer of the gun to Campfield moments before the shooting occurred. The record is uncontradicted that it was Kimbrough who cocked the gun, enabling it to be immediately discharged, and left it in that condition when it was taken by Campfield.

¶ 18 Kimbrough argues that the evidence did not prove that he possessed the requisite *mens rea* because Campfield took the gun from him after he had put the gun in a non-offensive position. Appellant's Supplemental Brief on Reargument at 4. An accomplice must act with the same *mens rea* as his principal when "causing a particular result is an element of an offense." 18 PA. CONS. STAT. ANN.

§ 306(d). Third-degree murder [4] requires no specific intent to kill. *Commonwealth v. DiStefano*, 782 A.2d 574, 582 (Pa.Super.2001), *appeal denied*, 569 Pa. 716, 806 A.2d 858 (2002). The *mens rea* for third degree murder is malice, which has been defined as

> [w]ickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured .... [M]alice may be found where the defendant consciously disregarded an unjustified and extremely high risk that his actions might cause serious bodily injury.

*Id.* (internal quotations and citations omitted).

¶ 19 By convicting Kimbrough, the jury found that he acted with malice. The testimony established that Kimbrough waved a loaded gun in firing condition around a crowded bar, threatened Dennis Walker and the other patrons, and allowed Campfield to take the loaded gun from him without incident. Based upon this evidence, the jury could have easily concluded that Kimbrough acted with "recklessness of the consequences", had "a mind with no regard for social duty", and that Kimbrough "consciously disregarded an unjustified and extremely high risk that his actions might cause serious bodily injury." *See DiStefano, supra*, 782 A.2d at 582.

¶ 20 Although it addresses accomplice liability in a first degree murder case, *Commonwealth v. Coley*, 350 Pa.Super. 549, 504 A.2d 1286 (1986), *appeal denied*, 514 Pa. 641, 523 A.2d 1130 (1987), remains instructive. The petitioner, Coley, had been convicted of first degree murder although he had not been the actual shooter. In his PCHA appeal, Coley raised an objection to the trial court's instruction on

---

4. 18 PA. CONS. STAT. ANN. § 2502(c).

first degree murder. In addressing the issue of shared criminal intent, the court stated:

As the Commonwealth notes, whether or not appellant was the actual shooter is irrelevant, as appellant's shared criminal intent to kill can be inferred from the circumstances of the killing itself. *Commonwealth v. Bachert,* 499 Pa. 398, 453 A.2d 931 (1982) *cert. denied* 460 U.S. 1043, 103 S.Ct. 1440, 75 L.Ed.2d 797 (1983). The circumstances proved at trial were that appellant provided the gun which was used to kill the victim, appellant was present at the time of the killing, and also took part in attempting to dispose of the weapon. These circumstances clearly show a shared criminal intent. Therefore, the first degree murder instruction was not defective, and both trial and PCHA [counsel] were not ineffective in failing to pursue this claim.

504 A.2d at 1289.

¶ 21 Kimbrough further contends there is no showing that he knew Campfield would use the gun criminally as they stood outside the Broadway Bar. Brief for Appellant at 17–18. A person can end his complicity if "he terminates his complicity prior to the commission of the offense *and:* (i) wholly deprives it of effectiveness in the commission of the offense; or (ii) gives timely warning to the law enforcement authorities or otherwise makes proper effort to prevent the commission of the offense." 18 PA. CONS. STAT. ANN. § 306(f)(3) (emphasis added).

¶ 22 We are unpersuaded by this argument inasmuch as there is no evidence that Kimbrough took any verbal or physical action to stop Campfield from firing the gun at the victims. N.T. 06/13/2000 at 212. While Kimbrough argues that he terminated his complicity in the use of the gun, it was, in fact, Raquel Waiters who pushed Kimbrough's arm down so that the gun

was no longer pointed at Dennis Walker. N.T., 06/13/2000 at 205. Based upon Kimbrough's failure to prevent the cocked gun from being used, and again viewing the evidence in a light most favorable the Commonwealth, the jury could have easily concluded that Kimbrough made no attempt to terminate his participation.

¶ 23 Further, the jury also heard testimony of Kimbrough's words and actions following the shooting, which left the jury with the impression that Kimbrough and Campfield were working in concert. Waiters testified that after the shooting, Kimbrough said of Campfield, "That's my man". N.T., 6/13/2000 at 218. Morris testified about Kimbrough's post-shooting conduct, specifically that he was going to have Morris drive him and Campfield to New York to get more guns, and how Kimbrough coerced Morris and Campfield into executing false affidavits stating that Kimbrough was not present on scene at the time of the shooting. N.T., 06/15/2000 at 339–341. This testimony established an association between Campfield and Kimbrough. Such post-killing conduct created an inference of Kimbrough's complicity and consciousness of guilt. *See Commonwealth v. Rios,* 554 Pa. 419, 428, 721 A.2d 1049, 1053 (1998) (possessing the same intent to kill was inferred, in part, from actions taken by accomplice after the shooting).

¶ 24 Kimbrough attempts to distinguish his circumstances from those in other cases where the Pennsylvania courts have found accomplice liability to exist. Kimbrough argues that in order for him to be an accomplice of Campfield, the two must have worked as a team throughout the entire criminal episode. Supplemental Brief for Appellant at 5. However, "[a]n explicit or formal agreement to commit crimes can seldom, if ever, be proved and it need not be, for proof of a criminal partnership is almost invariably extracted

from the circumstances that attend its activities." *Commonwealth v. Kennedy,* 499 Pa. 389, 395, 453 A.2d 927, 929–30 (1982) (internal quotations omitted). "Whether an accomplice possesses the same intent to kill as his co-conspirator may be inferred from words, conduct, the attendant circumstances including the actions taken after the killing and all reasonable inferences that follow from them." *Rios,* 554 Pa. at 428, 721 A.2d at 1053.

¶ 25 Inexplicably, in support of his contentions of insufficient evidence, Kimbrough cites to three other cases, *Commonwealth v. Orlowski,* 332 Pa.Super. 600, 481 A.2d 952, 960 (1984), *Commonwealth v. Woodward,* 418 Pa.Super. 218, 614 A.2d 239, 242–43 (1992), and *Commonwealth v. Rosario–Hernandez,* 446 Pa.Super. 24, 666 A.2d 292, 297 (1995), where convictions for accomplice liability were *affirmed,* despite lesser acts of concert or collusion than are present in the instant case. None of these cases, however, changes the law in Pennsylvania that only the least degree of concert or collusion is required to support a finding of accomplice liability.

¶ 26 In *Commonwealth v. Orlowski,* 332 Pa.Super. 600, 481 A.2d 952 (1984), the defendant's actions in trying to acquire a gun, eventually getting a gun (although a different one than the gun ultimately used by the shooter), and providing a shirt to cover his accomplice's tattoos constituted sufficient concert or collusion to support a finding of accomplice liability. *Id.* at 960.

¶ 27 In *Commonwealth v. Woodward,* 418 Pa.Super. 218, 614 A.2d 239 (1992), the defendant's act of entering into a fray between the victim (Himmons) and the killer (Jerry), with the knowledge that the victim had already been stabbed by the killer, "establish[ed] that [defendant] understood the nature of the encounter between Jerry and Himmons and acted with the intent of facilitating or promoting the murder of Himmons," although the defen-

dant had not been involved in the actual stabbing; therefore, the evidence supported a finding of accomplice liability. *Id.* at 242–43, 614 A.2d 239.

¶ 28 In *Commonwealth v. Rosario–Hernandez,* 446 Pa.Super. 24, 666 A.2d 292 (1995), we found sufficient evidence to support a finding of accomplice liability where the defendant therein was the driver of the getaway car, speeding off after his cohort fatally shot the victim. *Id.* at 297.

¶ 29 Kimbrough seizes upon *Commonwealth v. Cunningham,* 301 Pa.Super. 209, 447 A.2d 615 (1982), as support for his argument that his asserted lack of "direct" participation in the shooting of Derrick Walker precludes a finding of accomplice liability. *Cunningham,* however, does not stand for the proposition that direct participation is required in order to be responsible under an accomplice theory.

¶ 30 In *Cunningham,* the appellant was observed chasing Kates, a suspected thief, through a vacant lot, detaining him by hitting him in the leg with a baseball bat, and identifying Kates as the person who had burglarized Perez' apartment. *Id.* at 616–617. Perez was a tenant of the appellant Cunningham. *Id.* When Perez caught up to them he beat Kates with an ax handle. *Id.* at 616. Other testimony revealed that Cunningham attempted to stop Perez and was able to eventually pull Perez away from Kates. *Id.* This Court found that Cunningham's identification and detainment of the victim, in light of the totality of the circumstances, were insufficient to prove accomplice liability.

It is undisputed that appellant detained Kates by hitting him in the leg and identified him as the thief to Perez. This, however, was the only evidence adduced at trial which could lead the jury to infer that appellant was an accomplice to the murder. On the other hand, there was undisputed testimony that appellant could not see Perez ap-

proaching with a piece of wood and that he attempted to restrain Perez from hitting Kates. Even without the mitigating explanation concerning appellant's actions, the identification and detainment in light of the totality of the circumstances are insufficient to prove intent beyond a reasonable doubt. Though aiding and abetting may be established by circumstantial evidence, the proof must lead to more than suspicion or conjecture.

*Id.* at 617.

¶ 31 In the present case, Kimbrough, after a conversation, the content of which is unknown, sent his half-brother and co-defendant, Frederick Campfield, to an apartment to get a gun. N.T., 06/15/2000, at 301. Kimbrough ordered his driver, Jack Morris, to take Campfield to get the gun. *Id.* at 302, 447 A.2d 615. Campfield and Morris carried out these instructions, returning to the Broadway Bar where the gun was given to Kimbrough. *Id.* at 309, 447 A.2d 615. Kimbrough cocked the gun, making it ready to fire. *Id.* Kimbrough brandished it, threatened patrons, and threatened Dennis Walker, the victim's brother. N.T., 06/15/2000 at 310–11; 6/13/2000 at 203.

¶ 32 Although it is well settled that mere presence at the scene of a crime is not enough to establish accomplice liability, *Commonwealth v. Gooding*, 818 A.2d 546, 550–551 (Pa.Super.2003), *appeal denied*, 575 Pa. 691, 835 A.2d 709 (2003), Kimbrough's actions clearly separate him from the bystanders at the scene, and establish him as the instigator and promoter of the shooting that evening. In convicting Kimbrough, the jury found these actions to constitute active participation in the shooting which occurred on June 13, 1997. Inasmuch as we are not permitted to weigh the evidence or substitute our judgment for that of the fact-finder as sufficient evidence was presented, we af-

firm Kimbrough's convictions on accomplice liability on all counts.

¶ 33 The second issue raised is whether the guilty verdicts of third degree murder and voluntary manslaughter, both under accomplice theories, are mutually exclusive of each other and inconsistent. Kimbrough argues the trial court gave defective instructions which led to these inconsistent verdicts, and that the trial court should have required the jury to remain in deliberations until it reached a unanimous verdict on only one of the homicide charges. This issue is without merit.

¶ 34 It has long been the rule, of course, in Pennsylvania and in the federal courts, that consistency in a verdict in a criminal case is not necessary or required if there is evidence to support each verdict. *United States v. Vastola*, 989 F.2d 1318, 1331(3d Cir.1993); *Commonwealth v. Laird*, 555 Pa. 629, 648, 726 A.2d 346, 355 (1999); *Commonwealth v. Carter*, 444 Pa. 405, 282 A.2d 375 (1971). However, Kimbrough argues that the Pennsylvania Supreme Court has already deemed convictions of third degree murder and voluntary manslaughter as unlawfully inconsistent, *Commonwealth v. Brightwell*, 492 Pa. 424, 424 A.2d 1263 (1981), because "the major difference between murder of the third degree and voluntary manslaughter is the absence of malice in the latter." *Id.* at 426, 424 A.2d at 1264.

¶ 35 Our Supreme Court has stated that a conviction of voluntary manslaughter (unreasonable belief or imperfect self-defense) necessarily entails proof of intent to kill. *See Commonwealth v. Weston*, 561 Pa. 199, 206, 749 A.2d 458, 462 (2000). Here, co-defendant Campfield maintained that he acted in self-defense. Although the jury rejected this assertion, and convicted both him and Kimbrough of voluntary manslaughter, given Campfield's own testimony, it could have properly found him guilty of voluntary manslaughter, un-

reasonable belief killing justifiable, or imperfect self-defense. 18 PA. CONS. STAT. ANN. § 2503(b). Because the portion of the voluntary manslaughter statute which pertains to the facts of this case requires a showing of specific intent to kill, we find that the trial court did not err in accepting the guilty verdicts for both third degree murder and for voluntary manslaughter. Proof of both specific intent to kill and of malice does not render the verdicts impermissibly inconsistent. *See Commonwealth v. Meadows,* 567 Pa. 344, 352–353, 787 A.2d 312, 316–317 (2001); *Commonwealth v. Young,* 561 Pa. 34, 748 A.2d 166 (1999) (holding that there is no inconsistency where a jury convicts a defendant of both first degree murder (specific intent to kill required) and third degree murder (malice required)).[5]

 ¶ 36 Kimbrough next argues that he should be discharged because his rights to a speedy trial and to due process, as guaranteed by the United States[6] and Pennsylvania[7] Constitutions, were violated by the lengthy delays in the prosecution of his case. Kimbrough focuses his argument on three basic contentions: that overall it took over three years to bring his case to trial; that his case was particularly delayed by the trial court's decision to continue the case, after the jury had been selected, to complete a protracted civil trial; and that there was another break at the end of the trial, in order for the trial judge to take a vacation, after the evidence had been closed but before closing arguments. As a result, Kimbrough argues that he was prejudiced by "his inability to locate witnesses for his defense, the dimmed recollections of witnesses in his case, and his continued incarceration without a disposition in his case." Appellant's Supplemental Brief on Reargument, p. 27.

 ¶ 37 Initially, we note that Kimbrough makes no separate argument that relief on appeal is warranted on the basis of the provisions of Pa.R.Crim.P., Rule 600.[8] In *Commonwealth v. Africa,* 524 Pa. 118, 569 A.2d 920 (1990), our Supreme Court articulated that a two-step process is used to analyze alleged violations of Pennsylvania's speedy trial rule. Preliminarily, we must determine if the delay itself was sufficiently long to be presumptively prejudicial. *Id.* at 123, 569 A.2d at 923. If we determine the delay to be presumptively prejudicial, the court then applies a balancing test wherein four factors are considered: the length of delay, reason for delay, defendant's assertion of the right to a speedy trial, and any prejudice to the defendant arising from the delay.[9] *Id.*

---

5. We note that had the trial court employed a progression charge in instructing the jury the issue regarding inconsistent verdicts could have been avoided. In *Commonwealth v. Loach,* 421 Pa.Super. 527, 618 A.2d 463 (Pa.Super.1993), *appeal denied,* 535 Pa. 655, 634 A.2d 219 (1993), an *en banc* panel of this Court approved the use of a progression charge in murder cases. That is, it is proper for a jury to be instructed that it should consider whether a defendant is guilty of the most serious degree or form of the crime which has been charged. If the jury determines that the accused is not guilty of the most serious degree of the crime, it then proceeds to consider, in descending order of seriousness, the guilt or innocence on the lesser degree and forms charged. Had the progression charge been employed in the instant trial, the verdict of guilty of third degree murder would have ended the jury's deliberations as to the charge of voluntary manslaughter.

6. U.S. CONST. amend. XIV

7. Pa. Const., Art. I, §§ 9 & 11.

8. Formerly Pa.R.Crim.P., Rule 1100, 42 PA. CONS. STAT. ANN.

9. The balancing test was originally set forth in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).

¶ 38 We have closely examined the record from the trial court to uncover the periods of delay. As indicated, the record is replete with filings by Kimbrough and his co-defendant, Campfield. The following chronology outlines the procedural history of this case:

1. June 13, 1997—Kimbrough arrested, charges include a capital offense.

2. June 18, 1997—Campfield's counsel, the public defender, petitions for appointment of private counsel due to conflict of interest in its representation of a co-defendant.

3. June 18, 1997—Trial Court appoints Thomas Nolan, Esquire, to represent Campfield.

4. September 12, 1997—Campfield files a *pro se* motion to remove Attorney Nolan and to have appointed new counsel, citing irreconcilable conflict.

5. October 14, 1997—Attorney Nolan files a petition to withdraw based upon Campfield's refusal to cooperate and to accept his advice.

6. October 17, 1997—Commonwealth files a response to petition to withdraw, requesting denial.

7. February 11, 1998—Kimbrough files a petition for habeas corpus challenging detention on basis of evidence presented at preliminary hearing. Kimbrough files an omnibus pre-trial motion, including a motion to sever.

8. February 24, 1998—Attorney Nolan files a second petition to withdraw as counsel for Campfield and requests appointment of private counsel.

9. February 24, 1998—Trial Court appoints Robert Galardi, Esquire, as lead counsel and Christopher M. Shields, Esquire, as co-counsel for Campfield.

10. June 29, 1998—Trial Court denies Kimbrough's petition for habeas corpus.

11. August 11, 1998—Attorney Galardi files a petition to withdraw as counsel for Campfield, citing busy civil caseload.

12. August 19, 1998—Kimbrough files an amended motion to sever citing desire to avoid delay in trial.

13. August 25, 1998—Trial Court appoints Robert McCormack, Esquire, as lead counsel, who thereafter continued to represent Campfield through trial.

14. August 31, 1998—Kimbrough files motion to dismiss pursuant to Rule 1100.

15. October 16, 1998—Attorneys McCormack and Shields file an omnibus pretrial motion on behalf of Campfield. Relief sought included request for appointment of a private investigator and leave to file supplemental omnibus motions if necessary.

16. October 19, 1998—Trial Court orders appointment of private investigator to perform 20 hours of service for Campfield.

17. October 19, 1998—Kimbrough files a second amendment to motion to sever.

18. October 22, 1998—Trial Court orders appointment of medical doctor for psychiatric evaluation of Campfield.

19. January 6, 1999—Campfield's attorneys file another omnibus pre-trial motion, including 1) a motion for extension of time within which to file notice of insanity or of mental infirmity defense and 2) a motion to expand time for filing pretrial omnibus motions.

20. January 19, 1999—Trial Court denies Kimbrough's motion to dismiss under Rule 1100.

21. January 20, 1999—Trial Court conducts omnibus hearing at which discovery and briefing deadlines are set.

22. August 26, 1999—Trial Court orders the excusal of Campfield's private investigator and the appointment of a second private investigator to perform 20 hours of service.

23. September 15, 1999—Trial Court orders that final pre-trial conference be

held on January 4, 2000, and that jury selection commence on January 18, 2000.

24. September 23, 1999—Kimbrough files a second amended motion to sever and motion for immediate trial.

25. September 28, 1999—Trial Court denies Kimbrough's second amended motion to sever and motion for immediate trial.

26. November 12, 1999—Kimbrough files a motion for appointment of medical expert to perform psychiatric examination. Trial Court grants motion.

27. January 3, 2000—Campfield requests continuance of trial date for completion of his firearms expert's investigation.

28. January 4, 2000—Trial Court conducts pre-trial conference; advises of need for continuance due to insufficient number of jurors summoned for capital case and notes Campfield's request for continuance. Kimbrough raises Rule 1100 (now Rule 600) and 6th Amendment speedy trial issues.

29. January 4, 2000—Trial Court grants Campfield's request for continuance and orders that trial commence on April 17, 2000. By separate order, Trial Court grants Campfield's motion to employ a firearms expert.

30. March 22, 2000—Campfield files amended omnibus pre-trial motion, including a request for change of venue.

31. April 17, 2000—Jury selection begins.

32. May 8, 2000—Jury selection ends. Trial Court breaks in order to begin unrelated protracted civil trial.

33. June 12, 2000—Jury sworn and testimony begins. Counsel for Kimbrough moves to dismiss based on pretrial delay.

34. June 21, 2000—Counsel for Kimbrough moves to dismiss based upon adjournment of case to July 5, 2000.

35. June 22, 2000—Testimony ends. Case continued until July 5, 2000 for closing arguments. Campfield sought one-day continuance to accommodate firearms expert.

36. July 5, 2000—Closing arguments; jury instructions; jury retires.

37. July 7, 2000—Jury returns verdicts.

 ¶ 39 With this chronology as a background, in order to determine whether Kimbrough is entitled to be discharged due to trial delay, we now apply the two-step analysis from *Commonwealth v. Africa.* The length of the delay, of course, is the "triggering mechanism." *Commonwealth v. Williams,* 457 Pa. 502, 506–507, 327 A.2d 15, 17 (1974). The delay of three years in this case is sufficient to trigger the inquiry under Pennsylvania law. *See Commonwealth v. Africa,* 524 Pa. at 123, 569 A.2d at 923 (holding that twenty-seven month delay was presumptively prejudicial); *Commonwealth v. Pounds,* 490 Pa. 621, 628, 417 A.2d 597, 600 (1980) (holding that delay of two years precipitated further inquiry).

¶ 40 Consequently, we must examine the remaining factors in light of the facts in this case. However, when we apply the factors outlined in *Africa* and *Barker,* we do not find that Kimbrough's speedy trial rights have been violated.

¶ 41 There were numerous reasons for the delays in Kimbrough's trial, many of them attributable to co-defendant Campfield. Campfield's communication difficulties with prior counsel, his attempts to obtain substitute counsel, the withdrawal of replacement counsel, and Campfield's continual filing of pre-trial motions, all required significant periods of attention by the trial court. Kimbrough's pre-trial motions, including his motions to sever and to dismiss pursuant to Rule 600, contributed to further delays. The trial court by ne-

cessity had to continue the trial due to an inadequate number of potential jurors being summoned for duty.[10] Finally, two continuances were ordered by the trial court which were not due to the tactics of the Kimbrough or his co-defendant: the trial court's decision to complete a civil trial after selection of the jury; and the trial court's adjourning the trial at the close of the evidence to take a pre-planned vacation.

¶ 42 Looking back at the reasons for the delay, we must now determine whether Kimbrough asserted his right to a speedy trial on a timely basis. *Commonwealth v. Africa*, 524 Pa. at 123, 569 A.2d at 923. Kimbrough raised his right to a speedy trial at numerous stages of the proceedings below. For example, on April 26, 2000, counsel for Kimbrough objected to the late scheduling of trial for June 12, 2000, which was ordered to accommodate the trial court's civil calendar. Prior to the start of the Commonwealth's case on June 12, 2000, counsel for Kimbrough again argued the motion to dismiss for failure to comply with speedy trial provisions. On June 21, 2000, counsel for Kimbrough moved to dismiss based upon the trial court's adjournment of trial until July 5, 2000. Clearly, Kimbrough properly preserved his objection to the continuances of trial.

¶ 43 The fourth factor requires the demonstration of prejudice caused by the delay in trial. *Africa*, 524 Pa. at 123, 569 A.2d at 923.

Prejudice, of course, should be assessed in the [sic] light of the interests of defendants which the speedy trial right was designed to protect. This Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system. If witnesses die or disappear during a delay, the prejudice is obvious. There is also prejudice if defense witnesses are unable to recall accurately events of the distant past. Loss of memory, however, is not always reflected in the record because what has been forgotten can rarely be shown.

*Commonwealth v. Smalis*, 527 Pa. at 382–83, 592 A.2d at 672 (internal quotation omitted).

¶ 44 Kimbrough argues that he suffered prejudice due to the delay in trial in the following ways: (1) inability to locate a witness, Tyrell Brown; 2) witnesses' (Raquel Waiters and Dennis Walker) memories fading; 3) incarceration during the three-year delay; 4) delay in appeal process; 5) civil case taking priority over capital case; 6) pressure on counsel to complete trial within ten day period; 7) extended hardship on jurors faced with death penalty case they would have to decide; 8) dimming of jury's recollection during two-week break to accommodate court's vacation; and 9) trial court's misplaced emphasis on counsel's closing arguments. Brief for Appellant at 30–31.

¶ 45 As aforesaid, we conclude that Kimbrough has not demonstrated entitlement to relief due to the delays in the completion of his trial. Although the delay of three years raised a presumption of prejudice, Kimbrough has not demonstrated any actual prejudice caused by the delay. He has identified one witness, Tyrell Brown, who was not available for trial. However,

10. A reasonable extension of time for the commencement of trial from January 2000 to April 2000 was made by the trial court in order to have an adequate number of potential jurors summoned for duty.

he has not challenged the Commonwealth's assertion that this witness was unavailable as early as 1997.[11] Therefore, the three year delay did not affect Brown's availability as a witness for Kimbrough at trial.

 ¶ 46 Other delays were imposed by co-defendant Campfield who actively sought continuances in order to prepare for trial. He filed numerous pre-trial motions concerning the need for appointment of experts. The delays caused by Campfield are attributable to appellant. In *Commonwealth v. Long*, 367 Pa.Super. 190, 532 A.2d 853, 855 (1987), *appeal denied*, 518 Pa. 617, 541 A.2d 744 (1988), we held there was no abuse of discretion in denying a co-defendant's motion to dismiss pursuant to Rule 600, because the delays caused by a co-defendant were also attributable to other co-defendants when separate trials would have required the duplication of testimony and evidence, and would have imposed the burden of two lengthy trials on the trial court. We recognize that Kimbrough sought to sever his case from Campfield; however, the trial court denied Kimbrough's motion to sever.[12] Kimbrough has not raised the propriety of that ruling as a separate issue on appeal. Therefore, the continuances necessitated by the pre-trial motions filed by Campfield are properly excluded from periods of delay, and form no basis upon which to find that there was a violation of Kimbrough's constitutional rights. *Id.*

¶ 47 Kimbrough also fails to demonstrate that the trial testimony of Raquel Waiters and Dennis Walker supports a claim of diminished recollection. Neither witness cited the passage of time as a basis for arguably inconsistent testimony. N.T., 6/13/2000, at 250–52, 267–69, 272; N.T., 06/15/2000, at 230–36. Rather, these portions reflect the difficulty each witness had with explaining whether Campfield grabbed the gun from Kimbrough or whether Kimbrough gave the gun to Campfield. The inconsistencies, if any, resulted from the witnesses' ability to observe the incident as it occurred or from the witnesses' attempts to explain prior sworn testimony. Kimbrough has not shown that the delay in commencement of trial in any way affected his ability to cross-examine Waiters or Walker.

¶ 48 The remaining allegations of prejudice do not specifically describe the manner in which the defense was hampered. They are descriptions of the delays, and bald assertions of prejudice, rather than demonstrations of prejudice. In the absence of a showing of prejudice, the dismissal of charges for a violation of speedy trial rights is not appropriate. *Commonwealth v. Adamo*, 431 Pa.Super. 529, 637 A.2d 302, 308 (1994).[13]

¶ 49 In sum, we find that the delays in trial were largely due to continuances caused by the co-defendant and Kimbrough, and by necessary judicial schedul-

---

11. At oral argument before the trial court on June 12, 2000, counsel for Kimbrough identified Tyrell Brown as one of several witnesses who had given statements to the police and who were not available at the time of trial. N.T., 06/12/2000, at 7. The prosecutor represented to the court that these witnesses, including Tyrell Brown, had been unavailable since 1997, and, therefore, the delay in trial was not the cause of their unavailability. *Id.* at 12. Defense counsel did not factually counter this representation. *Id.*

12. Memorandum and Order, June 28, 1999 (Minora, J.).

13. Additionally, Kimbrough fails to support his argument on the remaining reasons for delay with any relevant legal authority. Brief for Appellant at 29–30. The failure of Kimbrough to sufficiently explain a claim results in waiver. Pa.R.A.P., Rule 2119(b), 42 PA. CONS. STAT. ANN.; *Commonwealth v. Dodge*, 2004 Pa.Super. 338, 2004 WL 1921178, *2, 859 A.2d 771 (Pa.Super.2004).

ing. Most importantly, Kimbrough has failed to demonstrate harmful prejudice as a result of the three year delay in bringing him and Campfield to trial.

¶ 50 Kimbrough next claims that the trial court erred in failing to suppress two affidavits used by the Commonwealth at trial. These affidavits were executed by co-defendants Morris and Campfield and stated that Kimbrough left the Broadway Bar before the shooting occurred. The affidavits were sent by Kimbrough directly, that is, without the assistance of counsel, to the office of the district attorney. At trial, Morris testified that both affidavits were false and that he executed his after perceiving a threat by Kimbrough if he did not make the averment. N.T., 06/15/2000, at 339–341.

¶ 51 Kimbrough argues that because the affidavits were sent by him, and not through counsel, their use at trial was violative of his constitutional right to counsel and right against self incrimination, and violative of the attorney-client privilege. This argument is meritless. The actions taken by Kimbrough in an attempt to influence the outcome of the case were relevant to the issue of guilt. There is no showing that the unsolicited affidavits were the product of prosecutorial coercion. Because they were submitted by Kimbrough through the mail, and not during a critical phase of the prosecution, there was no denial of the right to counsel. A defendant has a right to counsel at every critical stage of a criminal proceeding. *Commonwealth v. Johnson*, 574 Pa. 5, 13–15, 828 A.2d 1009, 1015 (2003). A stage in a criminal proceeding is considered critical when certain legal rights may be lost if not exercised at that stage. *Id.*

¶ 52 Because Kimbrough acted independently of his counsel when he sent the material to the district attorney's office, he can not now complain that he was denied counsel at a critical stage. There

was no search and seizure violation. The right against self-incrimination was not implicated because Kimbrough was not subject to custodial interrogation. Furthermore, we cannot say that Kimbrough intended the affidavits to be confidential since he sent them to the District Attorney himself. The affidavits were not subject to the attorney-client privilege as there had been no communication between Kimbrough and counsel concerning them. Kimbrough may not use his constitutional right to counsel to avoid the consequences of his own unwise self-help initiative. *See Commonwealth v. Goldblum*, 498 Pa. 455, 447 A.2d 234 (1982)(the attorney-client privilege did not apply to communications which were publicly disclosed at the direction of the defendant); *Commonwealth v. Boyd*, 397 Pa.Super. 468, 580 A.2d 393 (1990)(defendant's letter to his attorney containing details of crime was not confidential communication after defendant hung letter on his cell wall).

¶ 53 We next address whether the trial court abused its discretion in limiting the cross-examination of Morris. Kimbrough argues that his trial counsel should have been permitted to inquire of Morris the question, "Did you have any malice in your heart that night?" Brief for Appellant, at 33. He posits that, because Morris pled guilty to third degree murder and had already testified that he did not intend to injure or kill anyone on the night of the shooting, the question regarding malice should have been allowed.

¶ 54 A challenge to the extent of cross-examination is governed by the following principles:

[W]e note that in cross-examining a witness, an attorney is entitled to question the witness about subjects raised during direct examination as well as any facts tending to refute inferences arising from matters raised during direct testi-

mony .... Similarly, an attorney may discredit a witness by cross-examining the witness about omissions or acts that are inconsistent with his testimony .... However, the scope and limits of cross-examination is [sic] vested in the trial court's discretion and that discretion will not be reversed unless the trial court has clearly abused its discretion or made an error of law.

*Commonwealth v. Begley,* 566 Pa. 239, 276–77, 780 A.2d 605, 627 (2001) (internal citations omitted).

¶ 55 We find no abuse of discretion in the trial court's sustaining the objection to the question about malice because counsel had already established that Morris was without intent to injure or kill the victim or anyone else on the night of the shooting. The jury was also informed that he had pled guilty to third degree murder. There was no abuse in limiting the questioning of Morris regarding the presence of malice because it would have added little, if anything, to the prior question concerning lack of intent. It was within the province of the jury to determine whether the facts supported the finding that Kimbrough acted with malice.

¶ 56 Kimbrough next argues that the trial court abused its discretion in allowing the prosecution to question him about the use of an alias, "Frederick Kimbrough." Kimbrough contends that the prosecution engaged in misconduct in using unadmitted, and inadmissible, documents concerning prior criminal activity, when Kimbrough was questioned about the alias. This issue also lacks merit.

¶ 57 The jury was not tainted with knowledge of the contents of these documents because the offending documents were not identified to the jury, seen by the jury nor admitted into evidence. The trial court allowed the prosecutor to inquire on a limited basis as to whether Kimbrough had ever used a particular alias, had resided at a particular address, and had used a particular phone number. N.T., 06/20/2000, at 14–15. The jury was not informed that the documents were arrest records, and we do not find that it was likely that the jury could have inferred that the documentation pertained to criminal records. N.T., 06/20/2000 at 11.

¶ 58 Kimbrough's final issue for our review is that his sentence is harsh and excessive and therefore constitutes an abuse of discretion by the trial judge. As will be more fully discussed below, Kimbrough's minimum sentence actually fell within the standard range, although the trial court thought it was giving a sentence outside of the standard range.

■ ¶ 59 A challenge to the discretionary aspects of a sentence requires an appellant to set forth a separate, concise statement of the reasons relied upon for allowance of appeal. Pa.R.A.P., Rule 2119(f), 42 Pa. Cons. Stat. Ann. In addition, the appellant must raise a substantial question as to the appropriateness of the sentence, which would permit us to accept the appeal as to this issue. *Commonwealth v. Boyer,* 856 A.2d 149, 151, (Pa.Super.2004).

■ ¶ 60 In the present case, Kimbrough has complied with the procedural requirements of presenting this issue for appeal. *See* Pa.R.A.P., Rule 2119(f), 42 Pa. Cons. Stat. Ann. In his Rule 2119(f) statement, Kimbrough stated, as a basis for reversal, that the minimum sentence, which was within the aggravated range of the sentencing guidelines, was an abuse of discretion because, *inter alia,* 1) Appellant's outstanding parole violations were not yet resolved; 2) the presumptive minimum sentence within the aggravated range was eleven years; 3) the Appellant showed remorse; 4) Appellant had engaged in previous efforts at rehabilitation; 5) the sentences for the homicide convic-

tions merged; and 6) lack of an "unusually sinister" homicide.

 ¶ 61 Whether a substantial question has been raised that a sentence is inappropriate under the Sentencing Code must be evaluated on a case-by-case basis. *Commonwealth v. Titus,* 816 A.2d 251 (Pa.Super.2003). A substantial question exists where the brief sets forth a colorable argument that the sentence violates a particular provision of the Sentencing Code or is contrary to the fundamental norms underlying the sentencing scheme. *Commonwealth v. Reynolds,* 835 A.2d 720 (Pa.Super.2003). After careful review and for the reasons that follow, we find that because the sentencing judge imposed sentences that were *within* the standard range of the applicable guidelines, and that he fully stated his reasons for imposing those sentences, no substantial question has been presented.

 ¶ 62 For appellate purposes, the issue of which sentencing guidelines to apply is a legal question and not a discretionary matter. *Commonwealth v. Rivera,* 696 A.2d 223, 224 (Pa.Super.1997). "Amendments to the guidelines *shall* apply to all offenses committed on or after the date the amendment becomes part of the guidelines." 204 PA. CODE § 303.1(c), 42 PA. CONS. STAT. ANN. (emphasis added); *see Commonwealth v. Maneval,* 455 Pa.Super. 483, 688 A.2d 1198 (1997) (concluding that the sentencing court did not err by applying the guidelines that were in effect when this offense was committed). The sentencing guidelines changed for all felonies and misdemeanors committed on or after June 13, 1997. 204 PA. CODE 303.1 (effective June 13, 1997). Kimbrough was charged with the date of offense as June 13, 1997. The elements of third-degree murder are a killing done with malice. *Commonwealth v. Tolbert,* 448 Pa.Super. 189, 670 A.2d 1172, 1179 (Pa.Super.1995, *appeal denied,* 548 Pa. 617, 693 A.2d 588 (1997), *cert. denied,* 522 U.S. 891, 118 S.Ct. 230, 139 L.Ed.2d 162 (1997). The coroner testified that the injury and the death both occurred on June 13, 1997.[14] N.T., 06/12/2000, at 142. Therefore the new guidelines are controlling. Under the new guidelines, a third-degree murder conviction carries a minimum sentence of 10–20 years.

 ¶ 63 Because the minimum period of incarceration to which Kimbrough was sentenced falls within the standard range of the sentencing guidelines, Kimbrough is essentially challenging the court's imposition of a sentence to the statutory maximum of forty years for the third-degree murder conviction. "[W]hen the sentence is within the range prescribed by statute, a challenge to the maximum sentence imposed does not set forth a substantial question as to the appropriateness of the sentence under the guidelines." *Commonwealth v. Brown,* 402 Pa.Super. 365, 587 A.2d 4, 6 (1991).

 ¶ 64 Thus, the correct guidelines to be applied here are those effective June 13, 1997. The judge indicated at sentencing that he was "afford[ing Appellant] the presumption of the offense date of the 12th." N.T., 09/27/2000 at 30. This constitutes an error on the part of the trial judge because the legislature has made it mandatory that amendments to the guidelines shall apply to all offenses committed on or after the date of amendment. 204 PA. CODE § 303.1(c), 42 PA. CONS. STAT. ANN. But, because the judge imposed a legal sentence within the standard ranges of the applicable sentencing guidelines, we find this error to be harmless.

14. At no time prior to sentencing on September 27, 2000, was a modification of this date requested nor was a special interrogatory presented to the jury for the jurors to determine the actual date of the offense.

¶ 65 The statutory maximum sentence for third degree murder, a felony of the first degree, is forty years. 18 PA. CONS. STAT. ANN. § 1102(d). A minimum sentence shall be no more than one-half of the maximum. 42 PA. CONS. STAT. ANN. § 9756(b). The standard range minimum sentence for the third-degree murder charge, given Kimbrough's prior record score of three (3), is 120–240 months. The trial judge imposed a sentence of 240 months to 480 months or twenty to forty years. N.T., 09/27/2000, at 34.

¶ 66 The sentencing judge's decision will not be disturbed absent a manifest abuse of discretion. *Commonwealth v. Griffin*, 804 A.2d 1, 7 (Pa.Super.2002). A sentence that either exceeds the statutory limits or is manifestly excessive constitutes an abuse of discretion. *Commonwealth v. Mouzon*, 828 A.2d 1126, 1128 (Pa.Super.2003) (citing *Commonwealth v. Gaddis*, 432 Pa.Super. 523, 639 A.2d 462, 469 (1994). A sentence that is both outside the sentence guidelines *and* is unreasonable shall be vacated. 42 PA. CONS. STAT. ANN. § 9781(c)(3) (emphasis added). A sentence that is not unreasonable must be affirmed. *Commonwealth v. Smith*, 543 Pa. 566, 571, 673 A.2d 893, 895 (1996); *Griffin*, 804 A.2d at 7. Instantly, we find the sentence imposed to be neither outside the applicable guidelines nor unreasonable and therefore we affirm the sentence as imposed by the trial judge.

¶ 67 Even if the lower court had imposed sentence using the guidelines in effect on June 12, 1997, the trial court's sentence would be upheld, albeit the sentence was outside of the standard sentencing guidelines. When a court imposes a sentence outside the guidelines, it must provide a statement of the reason for its deviation from the guidelines. *Common-*

*wealth v. Eby*, 784 A.2d 204, 206 (Pa.Super.2001). The sentencing judge should show on the record that he is aware of the advisory guideline ranges. *Griffin*, 804 A.2d at 7–8. The sentencing judge should take "into account the protection of the public, the rehabilitative needs of the defendant, and the gravity of the particular offense as it relates to the impact on the life of the victim and the community." *Id.* at 8.

¶ 68 Kimbrough was sentenced to twenty years to forty years on the third-degree murder charge, and ten months to twenty-four months on each of the reckless endangering charges,[15] all sentences running consecutively to one another. Thus, the aggregate term of imprisonment is twenty-one years and eight months to forty-four years.

¶ 69 The trial court, in the course of imposing sentence, noted that it had the benefit of, and had reviewed, a presentence report. N.T., 09/27/2000 at 30, 33. The trial court also noted that it found Kimbrough's assertions of remorse unconvincing and incredible. *Id.* at 36. Further, the trial court determined that Kimbrough was an extremely poor candidate for rehabilitation. *Id.*

¶ 70 Upon review of the record, we determine that the aggregate sentence of not less than twenty-one years and eight months and not greater than forty-four years imprisonment is not inconsistent with any specific provision of the Sentencing Code. We conclude that the trial court properly considered all relevant factors and that the reasons it gave for the sentence imposed were permissible under the law. At sentencing, the trial court referred to the presentence investigation re-

---

15. Kimbrough does not raise a question as to the appropriateness of the sentences imposed for the two counts of reckless endangerment. Thus we deem any issue with regard thereto as waived and not before this Court for review.

port. The record fully supports the conclusion that the trial court was adequately informed; that it properly considered and enunciated its reasons for the sentences imposed beyond the minimum aggravated range of the guidelines; and that it fashioned an appropriate and reasonable sentence. We see no abuse of discretion and as such we dismiss Kimbrough's claim to the contrary.

¶ 71 Judgment of sentence affirmed.