Commonwealth *v.* Earnest, Appellant.

Argued May 27, 1941. Before SCHAFFER, C. J., MAXEY, DREW, LINN, STERN, PATTERSON and PARKER, JJ.

*Gilbert P. High* and *William F. Fox,* for appellant.

*Frederick B. Smillie,* District Attorney, with him *Harold G. Knight, Jr.,* Assistant District Attorney, for appellee.

546

OPINION BY MR. JUSTICE MAXEY, June 30, 1941:

On December 5, 1940, a jury adjudged William J. Earnest, aged 35 years, guilty of murder in the first degree and fixed the penalty at death. Sentence was imposed on April 17, 1941, and this appeal followed. The victim named in the indictment was Mrs. Ethel Atkins, aged 34 years, whose nude, bloody and brutally battered body was found on the stairway of an unoccupied home in Montgomery County on the afternoon of September 24, 1940.

The appellant was a chef in Philadelphia. His usual hours of work were from 8 p. m. to 8 a. m. On September 23, 1940, he had a "night off". At about 7 p. m. that day he left the house where he lived with a woman not his wife and with an adopted child, aged 9 years, and spent the entire night visiting various tap-rooms and "clubs", at all of which he drank copiously of beer and less copiously of whiskey. Between 2 and 3 a. m. he met at one of these places a casual acquaintance named Richard Brady. About 3 a. m. they offered to escort to her home a female employee of the tap-room they were then leaving. The invitation was accepted and on the way to the woman's home, all three visited four clubs, at all of which they drank beer and at one of which the appellant drank whiskey. They then went to another club where they were joined by Mrs. Atkins. All four remained at this club until 8 a. m. and then went to a diner where they drank coffee or tomato juice and the first woman was then "left out" in front of her home. Mrs. Atkins was then "taken for a ride", she readily consenting. Appellant drove the car. Their common quest was for a "quiet spot" in Montgomery County. On Dreshertown Road a vacant house, with which appellant admitted he was "familiar", was noticed. After driving past the house, the appellant "backed up and drove in". Finding the doors locked, appellant broke a window, entered the house and admitted Brady and Mrs. Atkins by the kitchen door.

Mrs. Atkins said she "did not want Brady to watch" and appellant asked Brady to stay out. Appellant and Mrs. Atkins first occupied a couch in the kitchen and he made a proposal to her which she rejected, saying "she was out all night and wanted to go to bed." She next "took off her dress and slip" and declared that she "did not want to do anything until she had a bed. She asked about the upstairs and he said he would see." As they were going through the house they noticed Brady "looking in the window". Mrs. Atkins said: "Look at Peeping Tom." She and appellant then went upstairs, where there was only a dismantled bed "against the wall". According to appellant, Mrs. Atkins then lay on the floor, they accomplished their purpose and she then informed him that she had a venereal disease[1] and quickly thereafter grabbed him in such a way as to cause him such pain that he fainted. He added: "When I came to she was standing there with a stick" and "she brought the stick around three times and the third time I got it and she reached down again and grabbed him again" as she had done previously. He continued: "I hit her with the stick and she fell up against the bed post, then she was up right away and she was flying at me like a wild woman. I hit her; I hit her a lot but I did not mean to kill her." He admitted that he "hit her with the stick, on the head, on the head, on the head, all the time." He added: "I remember having the bed in my hand and I hit her twice with that and I fell, and when I fell the bed was on top of her and I picked it up. I went out. I seen what I had done. I did not mean to kill her." Appellant would not admit inflicting the injuries Mrs. Atkins suffered in the abdominal and genital regions of her body. The autopsy disclosed multiple wounds. As

---

[1] The examination made of Mrs. Atkins' body after her death and the chemical tests made of her blood showed that she had no venereal disease.

the coroner's physician described the wounds, "there was a large laceration of the scalp down to the bone. It left a dented area six by two inches in diameter. There were three deep lacerations upon the face just to the left of the outer corner of the left eye. These extended down to the bone. The left side of the lower lip was torn away by an irregular gash that covered an area two inches in diameter. This extended down to the lower jaw bone and exposed two teeth. Several teeth had their cutting edges broken. . . . There was a narrow semi-circular laceration five and a half inches long just above the right breast." The physician then described the lacerations in the genital region evidently inflicted with an inserted club and which injuries "would have caused death eventually". The cause of death was "hemorrhage from multiple lacerations of the head and body and some hemorrhages from these wounds." The victim's body was drained of practically all its blood. The chief county detective who entered in the afternoon the room where Mrs. Atkins was killed in the morning found "a large pool of blood three feet seven inches in length and one foot wide. The entire area was smeared up and there were thick clots of blood and pieces of hair matted in the blood." He also found a bloody club, thirty-one inches in length and one and one-quarter inches in diameter. There were "a number of hairs caught in the rough edges of the club and also the crack". There was also "a broken end of a stick, bloody and split". He said he "approximated the ends of this club" with the one already described.

Richard Brady testified that when Earnest came downstairs (after killing Mrs. Atkins) "he had a cut on his hand and there was some blood there and some blood on his shirt collar and on the side." Earnest would not let Brady go up-stairs. The only sounds Brady admitted hearing as he sat outside in the car was "the shuffling of feet". Brady when asked if Earnest was intoxicated at the time they left the first

woman in the morning and started "to the farm" (where the killing took place) answered: "He did not seem to be."

It was the theory of the Commonwealth that this was a sadistic murder and the condition of the victim's body as revealed by the medical testimony and by the photographs received in evidence strongly supports this theory.[2]

The evidence in this case justified the verdict of murder in the first degree with the penalty fixed at death. The brutality exhibited by this killer clearly proved that he was animated by that malice which is the essential ingredient of murder. Here is a case where malice "is implied from the outrageous circumstances of the act, showing a cruelty of disposition, a heart regardless of social duty and fatally bent on mischief."[3] In this killer we find that "wickedness of disposition, hardness of heart and cruelty" which Justice AGNEW said characterizes the murderer.[4] The evidence also shows that the killer intended to kill. The many savage blows which he inflicted on his victim could have had no other purpose than to kill. The blotting out of the victim's life was their natural and inevitable consequence. The frequent repetition of these blows shows that the intent to kill was deliberately formed. Whether the intention to kill and the killing, that is, the premeditation and the fatal act, were within a brief space of time or a long space of time is immaterial if the killing was in fact intentional, wilful, deliberate and

---

[2] "The tortures inflicted by the sadist on his victim are often unbelievable. He beats her alive and he sometimes continues to beat her after death . . . in short, he falls upon her with the veritable fury of a wild beast. Mutilations of the cadaver may also be numerous and varied. . . . There is one mutilation that dominates all; it is the sadistic mark, and that is the mutilation of the genital organs": Medical-Legal Moral Offences—Thoinot & Weysse, p. 420.

[3] *Com. v. Lewis et al.*, 1 Addison 278, 282.

[4] *Com. v. Drum*, 58 Pa. 9.

premeditated. "No time is too short for a wicked man to frame in his mind his scheme of murder and to contrive the means of accomplishing it": (quoted by Justice AGNEW from *Com. v. Richard Smith* in *Com. v. Drum,* supra). As Justice AGNEW said in Com. v. Drum: "The law fixes upon no length of time as necessary to form the intention to kill, but leaves the existence of a fully formed intent as a fact to be determined by the jury, from all the facts and circumstances in the evidence."

Among the assignments of error stressed by the appellant are the first three, which relate to the introduction of photographs taken of the body of the victim while she was still lying on the stairway of the vacant house in which she had been murdered. This question was ruled by us in *Com. v. Dreamer,* 324 Pa. 220, 188 A. 117, where we said: "It was competent for the witness who discovered [the victim's] body to describe exactly what he saw, the condition of the body, and the objects which surrounded it. It was equally competent to present a photograph which portrayed these things more accurately than mere words could do." We added: "The admission in evidence of photographs of victims of murder has been sanctioned by this court and by courts of other jurisdictions, provided that the photograph was not offered and was not used for the purpose of inflaming the minds of the jurors against the accused." (Citing cases.) What we said in that case (which in its motive and methods closely resembles this one) is applicable here: "The crime itself as necessarily revealed by the testimony of those who saw the body and by the physician who made the required post-mortem examination was of such an atrocious character that no mere photographs could add anything to the feelings which would naturally be aroused in the breast of any civilized human being, against its perpetrator. These photographs did not convict the defendant of this crime. His conviction was based on other evidence,

ample and convincing." These assignments are overruled.

The fifth and sixth assignments of error are based on the address of the district attorney. No exception to this address was taken in the proper manner. Appellant's chief complaint as to the address is that the district attorney argued to the jury in effect that if a life sentence was imposed instead of the death penalty, some future Board of Pardons might release the convict "in five years, ten year, twenty years, . . . it can always let them out and it does." In making that argument the district attorney was indulging in conjecture and was intimating that the Board of Pardons might be derelict in its duty. Such an argument is improper and is out of place in an address by a district attorney. That official should always bear in mind that he is a quasi-judicial officer. See *Com. v. Capalla,* 322 Pa. 200, 204-5-6, 185 A. 203. The trial judge in his charge clearly and fairly instructed the jury as to its function in fixing the penalty and the remarks of the district attorney, even if properly excepted to, would not under these circumstances be adjudged by us to be prejudicial error.

The eighth and ninth assignments of error refer respectively to the admission on the record of prior convictions of this appellant for crimes involving moral turpitude, to wit: sodomy and larceny. This evidence was admissible for two purposes, first, to discredit the defendant, and second, to furnish the jury with data to be used by them in determining the appropriate punishment in the event they found the defendant guilty of murder in the first degree. See *Com. v. Herman Petrillo,* 341 Pa. 209. The evidence was offered and admitted for the second purpose only. The trial judge in his charge carefully instructed the jury that the records of defendant's former convictions "had no place in their deliberations in determining whether this defendant is guilty" of any crime or "in fixing the degree of guilt" but they could be considered only in fixing

the punishment after the jury should come to the conclusion that the defendant was guilty of murder in the first degree.

No other assignments of error require discussion. All the assignments of error are overruled.

The trial was fair, the verdict just, and the penalty appropriate.

The judgment is affirmed. The record is remitted to the court below so that the sentence may be executed.