Commonwealth *v.* Morgan, Appellant.

Argued November 18, 1947. Before RHODES, P. J., HIRT, DITHRICH, ROSS, ARNOLD and FINE, JJ. (RENO, J., absent).

*Lemuel B. Schofield,* with him *Marvin Comisky,* for appellant.

*Raymond V. John,* Assistant District Attorney, with him *John H. Maurer,* District Attorney, for appellee.

OPINION BY DITHRICH, J., January 8, 1948:

Defendant, a practicing physician, was convicted of raping a woman patient in his office. From refusal of his motion for a new trial and the imposition of sentence, he has brought this appeal. The assignments of error are numerous, but the chief burden of his argument is that the verdict of the jury was against the weight of the credible evidence. While parts of the testimony of the prosecutrix may upon review appear to be rather farfetched, on final analysis the reasonableness of her testimony was for the jury and, as opposed to the testimony of defendant, we cannot say that the jury erred in accepting it and rejecting his. From the very nature

of the offense and especially its secretiveness, the task of the jury is almost invariably narrowed down to a choice between the testimony of the prosecutrix and that of the defendant. The charge is difficult to prove and equally difficult to defend against, and when the accompanying circumstances clearly point to the guilt of defendant, as in this case, no argument, no matter how plausible, can be permitted to prevail against the verdict of a jury.

Defendant had carnal knowledge of the prosecutrix, a young married woman 22 years of age, through fraud and deception, while she ostensibly was being given medical treatment, and pursuant to defendant's direction was in such a position that she could not see but could only feel what he was doing.

She first became a patient of defendant in July of 1943 and was treated by him biweekly for about a month and a half for an ulcerated womb. Defendant did not see her again until December, 1945, when she went to him for a checkup, as she had become underweight. Her husband was then in the navy. At defendant's importunities, she submitted to a re-examination and she was told that there had been a recurrence of her former trouble, that she could not bear a child, and later, in the presence of her husband, who was discharged from the navy in January, 1946, she was told to refrain from sexual intercourse while she was undergoing treatment. She continued going to him for treatment until March 26, 1946, the date of the alleged offense. She was three months pregnant at the time of trial.

On the occasion of the last visit, prosecutrix testified that defendant had penetrated her twice. The first time he had placed her flat on her back on his treatment table, had her place one leg over his shoulder, and then on the pretext that her vagina was congested "up so far that he could not reach it" for the purpose of massaging it with his finger, had her place her other leg over his other shoulder and then hold on to the end of the table.

While in that position she felt that she was being penetrated, and when she complained that it was hurting her defendant withdrew. He turned his back to her; and, while she suspected what had happened, she was not certain of it until after he had penetrated her the second time. This was accomplished by having her take the "knee-chest" position. In that position the patient is on her hands and knees with her head and chest lowered and the head between the hands. When she had taken that position she testified that defendant placed his hand on her back and forced her body down until it was only a few inches above the table. He then stood on a step at the end of the table and resumed the finger massage, but she very shortly experienced the same sensation she had while in the former position. She moved forward quickly and, looking backward through her legs, saw that defendant's person was exposed. She jumped off the table. Defendant again turned his back to her, fumbled with his clothing, presumably adjusting his fly, then turned around and asked her what was the matter. She told him he knew what was the matter and he then said "Oh, Ann, if you think I used anything else instead of my fingers, you are mistaken."

She dressed hurriedly and immediately left the doctor's office. Her husband, who was waiting for her in his truck, seeing that she was nervous, excited and somewhat disheveled, asked her what was wrong. Fearing to tell him all that had happened because of what he might do to defendant, she merely said that defendant's trousers had been open. Her husband immediately went into the doctor's office to demand an explanation. He was followed by his wife, and, when defendant made as though to console her, she told him not to dare touch her, that she was going to have him arrested. She then became hysterical, started to cry, and became so incoherent that defendant was able to persuade her husband that nothing out of the ordinary had happened, that his wife's condition was entirely due to nervous-

ness, that she was suffering hallucinations and suggested that he consult a psychiatrist.

When they got home the prosecutrix was seen by another physician. He felt that she was in no condition to be examined that evening, so he gave her a sedative and made an appointment for a vaginal examination the next morning, following which he suggested that she be examined by a gynecologist. That was done in the afternoon of the same day. After she had been given the sedative, she calmed down and was able to tell her husband exactly what had happened. After telephoning an attorney to have a warrant issued for defendant, the husband, accompanied by a brother-in-law, returned to defendant's office as he wanted to be sure just what position his wife had been placed in and "to hear what defendant had to say." It was at his wife's suggestion that the brother-in-law went with him, to restrain him should he become violent. Defendant, using the brother-in-law as a model, demonstrated the position he had placed the prosecutrix in, thereby confirming her statement to her husband.

On the day next following the vaginal examinations, prosecutrix went to the attorney's office and swore out a warrant for defendant's arrest. He denied that he had raped her or had been guilty of anything out of line with proper professional treatment and conduct. Following his arrest he had the prosecutrix, her husband, the brother-in-law, and two other men arrested on charges of blackmail and attempted extortion. He claimed the husband and brother-in-law demanded $20,000 when they called at his office the night of the alleged offense, and that the other two men had told him later that they could have the charge against him withdrawn if he would pay them $5,000. He said he turned down both offers. That case had not been tried at the time of the oral argument on this appeal, but on the trial of defendant it was denied that any demands had been made upon him for money or anything else of value.

This resume of what took place in the office of defendant and the events subsequent thereto bear out the Commonwealth's contention to a degree to make the charge of the prosecuting witness, that under the guise of unnecessary treatment he took advantage of her, anything but incredible. In support of its contention that the verdict is against the weight of the credible evidence, the defense stresses the fact that the prosecutrix made no outcry when she discovered what the defendant was doing to her. That contention is ably answered in the opinion of the learned court below: "While immediate outcry is a natural reaction to the usual type of rape, there was nothing in this case which called for an outcry. Rape is generally accomplished by . . . force and with the knowledge, but against the wishes, of the woman. She is in a state of violent fear of unwanted and abhorrent intercourse, of its probable serious and natural consequences, and also of the threats and physical violence by which it is accomplished. . . . But not one of these factors was present in the instant case. There was no force or violence (except the mere act of partial penetration accomplished under the guise of medical treatment) ; there were no threats; and, as soon as the suspicions of the prosecutrix were aroused, she pulled her body away and the defendant instantly adjusted his clothing and pretended she was just imagining things. The prosecutrix quite obviously had nothing to fear. There was no reason for an outcry." In that respect this case is readily distinguishable from *Commonwealth v. Berklowitz,* 133 Pa. Superior Ct. 190, 2 A. 2d 516; *Commonwealth v. Smith,* 115 Pa. Superior Ct. 151, 175 A. 177, and *Commonwealth v. Moran,* 97 Pa. Superior Ct. 120, cited by the defense in support of its contention.

The third assignment of error is that the trial judge erred in permitting the gynecologist called by the Commonwealth to testify that when he examined the woman the day following the alleged rape, he found no evidence

of infection. True, he stated on cross-examination that he could not say that she had not had a vaginal infection before he examined her, but no motion was made to strike his testimony given on direct examination. The assignment therefore is without merit. Cf. *Commonwealth v. Woloszchuk*, 133 Pa. Superior Ct. 470, 3 A. 2d 10; *Commonwealth v. Luccitti*, 295 Pa. 190, 145 A. 85.

The fourth assignment is that the trial judge erred in permitting the district attorney to demonstrate that the so-called "knee-chest" position, in which the prosecuting witness had placed herself at defendant's direction, was not impossible, as contended by defendant. He denied on direct examination that he had placed her in that position and volunteered the statement that "she would have to be an acrobat to do it"; and on cross-examination said "I would like to see her do it." The Commonwealth then offered to show that it could be done. The offer was objected to, the objection was overruled, and the prosecuting witness then, without removing any of her clothing, assumed on a table in front of the jury box the position that she said defendant had placed her in. Physical demonstrations in court are largely within the discretion of the trial judge, and, in view of defendant's effort to create in the minds of the jurors a doubt as to the possibility of the prosecutrix having been placed in that position, we find that the court did not abuse its discretion in permitting the Commonwealth to demonstrate the truth of the prosecutrix's statement. " 'His conviction was [not] based on [the demonstration but] on other evidence, ample and convincing' ": *Commonwealth v. Earnest*, 342 Pa. 544, 550, 551, 21 A. 2d 38. This assignment is overruled.

The fifth assignment is based on the refusal of the trial judge to withdraw a juror after the demonstration had been completed, and the prosecuting witness, visibly embarrassed, had begun sobbing and appeared somewhat distraught. This assignment likewise is without merit.

The remaining assignments of error are to the charge of the court. The sixth and seventh assignments, that the evidence submitted by the Commonwealth was unduly stressed and the evidence favorable to the defense slighted, and that the charge generally was inadequate, may be overruled without further comment than to say that the charge as a whole was fair, impartial, and completely adequate.

The eighth assignment is that the court erred in charging the jury as follows: "A great deal of stress has been put on: Why didn't she have this man arrested at once? The law doesn't demand it; the law permits anyone who has been raped to bring an action within two years. So that may form something of a guide as to whether the swearing out of an affidavit two days later was any undue delay." Specific objection having been taken to that portion of the charge, the court added: ". . . of course, I leave to you the question whether the fact that this husband phoned an attorney that night—that is if you believe their testimony—that she swore out a warrant on the morning of the second day after this happened, and that she did that instead of calling the police or complaining to the police, whether that was something which an aggrieved woman would have done. Would an aggrieved woman have gone to the police instead of pursuing this other course of action? And you may take it into consideration as to whether that in any way discredits her testimony." Whatever harm may have been done by the statement in the charge to which exception was taken, was corrected, and the jury properly instructed that when passing on the credibility of the prosecuting witness due consideration should be given to the fact that a lapse of approximately two days occurred between the commission of the alleged offense and the making of a formal complaint.

The ninth assignment is based on the alleged failure of the court to call to the attention of the jury in sufficient detail the theory of the defense that the prosecu-

tion was a plot to extort money from the defendant. In that connection the court charged the jury as follows: "There are in this case certain charges that the defendant and other parties were guilty of extortion and blackmail. [The court later explained to the jury that he had inadvertently said "defendant" when he meant "prosecutrix."] You must bear in mind that it is conceivable—I don't know whether it is so or not—it is conceivable that there might even have been an attempt at extortion and blackmail, but that is not the primary question before you, because even if there was, if that was based on actual rape, then this defendant would be guilty, regardless of whether any demand was made upon him.

"Your primary question is: Did he do what he is charged with doing? And if he did, he is guilty regardless of what the others may or may not have done. However, counsel for the defense would have a right to say that if there was any extortion or blackmail that that might convince you that this was not really a bona fide prosecution, that this defendant did not commit the rape."

There was no evidence in any way implicating the prosecuting witness in any attempt to extort money or to blackmail the defendant, and the only evidence as to the others was his uncorroborated testimony. We feel that the charge was adequate in that respect since as stated in the opinion of the court below: "There was . . . a substantial amount of innuendo of blackmail and extortion introduced by defendant's counsel into the case by his questions in cross-examination, although, as to the prosecutrix and as to demands, if any, made in the Magistrate's office, the defense offered no testimony whatever to support this cross-examination."

The tenth assignment is based on the court's comment on the demonstration referred to in the fourth and fifth assignments and requires no further discussion.

The eleventh and final assignment is that the court erred in saying to the jury that the woman's husband would have had no right to take the law into his own hands and "grab the defendant by the throat and slug him," as defense counsel contended before the jury the average, normal man would have done if he had been told by his wife that she had been raped. In this we find no error.

After the court had ruled on defendant's specific exceptions to the charge and had made certain revisions and additions, counsel for defendant was asked if he desired an exception to those statements and he answered, "No, sir. I thank you for that, sir." Because of the seriousness of the crime for which defendant, a man who had borne a good reputation, has been convicted and sentenced, and the effect it will have upon his professional career, we have examined the record in this case with painstaking care and can reach no other conclusion than that he was fairly tried, ably defended, and properly convicted. All of the assignments of error are overruled.

The judgment is affirmed and it is ordered that the defendant appear in the court below at such time as he may be there called and that he be by that court committed until he has complied with the sentence or any part of it which had not been performed at the time the appeal in this case was made a supersedeas.