J-S08045-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KRISTOPHER ALLEN SMITH | : | |
| | : | |
| Appellant | : | No. 610 MDA 2023 |

Appeal from the Judgment of Sentence Entered December 9, 2022
In the Court of Common Pleas of Lancaster County Criminal Division at
No(s): CP-36-CR-0002935-2018

BEFORE:   OLSON, J., MURRAY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:               **FILED: MARCH 21, 2024**

Appellant, Kristopher Allen Smith, appeals from the judgment of sentence entered in the Court of Common Pleas of Lancaster County following his conviction by a jury on one count of first-degree murder, three counts of burglary, one count of robbery, and two counts of conspiracy (to commit burglary).[1]  After a careful review, we affirm.

The relevant facts and procedural history are as follows: Dennis Pitch was shot and killed during a home invasion between the late evening and early morning hours of December 2 and 3, 2016, in Narvon, Pennsylvania.  His body was discovered by his brother and stepson on December 4, 2016, after he

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 2502(a), 3502(a)(1), 3701(a), and 903, respectively,

failed to appear for work. The victim sustained four gunshot wounds, as well as bruising and abrasions. There were no signs of forced entry into the victim's home; however, several rooms had been ransacked. Law enforcement recovered 9-millimeter shells from the home, as well as BBs that appeared to be from birdshot.

Following a sixteen-month investigation, charges were filed against Appellant and his three co-conspirators (Brandon James Bills, Christopher James Lyles, and Michael Patrick Baker)[2] on April 23, 2018, based on the presentment by the fifth Lancaster County Investigating Grand Jury. The Commonwealth alleged Appellant and his three co-conspirators traveled in Appellant's car on the night of December 2, 2016. The Commonwealth alleged that, after burglarizing an Amish-owned business in Lancaster County, Appellant parked his car at a church behind the victim's home, and he then retrieved two shotguns from the trunk. The Commonwealth further alleged

---

[2] Appellant's three co-conspirators were charged at separate docket numbers. Baker and Lyles were tried separately and convicted of second-degree murder. They were both sentenced to life in prison, and after they filed direct appeals, this Court affirmed their judgments of sentence. *See Commonwealth v. Baker*, No. 696-697 MDA 2022 (Pa.Super. filed 2/22/23) (unpublished memorandum); *Commonwealth v. Lyles*, 1367 MDA 2020 (Pa.Super. filed 4/1/22) (unpublished memorandum). Our Supreme Court denied Baker's petition for allowance of appeal. Lyles did not seek review by our Supreme Court.
Bills entered a negotiated guilty plea, and he was sentenced to five years to ten years in prison in exchange for his testimony against Appellant. Bills did not appeal his judgment of sentence.

Appellant, Baker, and Lyles entered the victim's residence while Bills remained in the car. During the home invasion, the victim was shot and killed.

Appellant was arrested on April 23, 2018, and on August 19, 2022, Appellant, who was represented by counsel, proceeded to a jury trial. The trial court has aptly summarized the evidence presented at Appellant's jury trial as follows:

> [T]he Commonwealth presented direct and circumstantial evidence at trial which proved that Pitch was shot and killed between 1:00 and 2:00 a.m. on December 3, 2016, in his home in Narvon. Dr. Wayne Ross, the forensic pathologist for Lancaster County, testified that the cause of death was four gunshot wounds to the head and chest, the manner of death was homicide. N.T., 8/23/22, at 443-44, 448-49, 451-52, 460-62[.] The time of death was estimated by Dr. Ross to be between the late hours of December 2, 2016, and the early morning hours of December 3, 2016. *Id.* at 474.
>
> There was forensic evidence that Pitch put up a fight as there were defensive wounds to his hands. [*Id.*] at 452. There was blunt force trauma to his body, face, chest, hands, and legs. *Id.* at 451. Pitch's face was swollen from being beaten. *Id.* Dr. Ross testified that the four shots that killed the victim were fired from a distance of three to four feet or greater. *Id.* at 456, 459, 461. From the physical evidence, Dr. Ross was able to determine that the bullets to the body were all fired downward. *Id.* at 459, 472-73. This suggested to Dr. Ross that Pitch was either on his knees or on the ground when he was shot and killed. *Id.* at 459. The victim was discovered lying on his stomach on the floor in the hallway between his bedroom and bathroom. N.T., 8/22/22, at 265-66, 354, 371-72. There was blood splatter on the hallway wall. *Id.* at 354, 370-71. His fatal wounds were from small-arms fire. N.T., 8/23/22, at 453, 457-61. No weapon was recovered from the scene. N.T., 8/22/22, at 354-55.
>
> The Commonwealth introduced evidence obtained by Trooper Donna Harrison of the forensic services unit at Pennsylvania State Police Troop J in Lancaster. [*Id.*] at 346. Upon arrival at the scene on December 4, 2016, shortly after 1:00 p.m., Trooper Harrison very quickly determined that this was a

- 3 -

homicide scene as the injuries had not been self-inflicted given the absence of the gun in the proximate area. *Id.* at 348, 354-55. While waiting for the approval of a search warrant, Trooper Harrison photographed the exterior of Pitch's residence, as well as the surrounding area. *Id.* at 356-65[.]

Once the search warrant was approved, Trooper Harrison began processing the interior crime scene at approximately 7:30 p.m. on December 4, 2016. [*Id.*] at 356, 365-66, 429. She initially photographed the rooms of the house. *Id.* at 366. She observed no obvious signs of forced entry to the home. *Id.* at 362-63, 378.

Trooper Harrison recovered two shell casings: one 9-millimeter casing on the living room floor and another on the dining room floor. [*Id.*] at 350, 368-69, 391[.] After the victim's body was removed by the coroner, another 9-millemeter shell casing was recovered from underneath the body. *Id.* at 395. A bullet hole was observed in the trim around the door leading into the victim's bedroom. [*Id.*] at 387-88. The bullet entered the trim on the hallway side and exited the back side of the trim, blowing off a piece of wood which landed on a chair in the bedroom. *Id.* at 388-89. The discharged round struck a stud in the back wall of the bedroom and ricocheted back out and landed on the bedroom floor. *Id.*

Trooper Harrison testified that another bullet was fired into the hallway floor, traveled through the insulation below, and imbedded in a floor joist in the basement. [*Id.*] at 392-93, 405. A bullet had also been fired in the hallway above where the victim's body had been and was removed from the drywall. *Id.* at 396-97. A live 9-millimeter round was recovered from the victim's bedroom floor. *Id.* at 394[.]

Trooper Harrison further processed the crime scene for latent fingerprints. [*Id.*] at 411-13. Nothing of value was recovered. *Id.* at 415-19. Trooper Harrison also attempted to locate and identify touch DNA from various objects recovered from the crime scene. *Id.* at 413. Again, nothing of identifiable value was found. *Id.* at 415-19.

On January 8, 2017, the victim's family was cleaning the house to get it ready for sale and discovered a hole in the bedroom floor when they removed the carpet. N.T., 8/23/22, at 549-50. The police were called, and Trooper Nelson Renno arrived the same day to investigate. *Id.* at 552, 577. He initially observed a BB or gunshot pellet stuck in the wood subfloor. *Id.* at 577[.]

Trooper Renno went into the basement and discovered small BBs on the floor and damage to the ceiling insulation and to a basement window. *Id.* at 578-79. In total, Trooper Renno recovered 65 birdshot-type BBs from the crime scene. *Id.* at 589.

The Commonwealth introduced trial testimony from several witnesses that Dennis Pitch's home, which was usually tidy and orderly, had been ransacked. N.T., 8/22/22, at 265, 277-78, 312, 373. In the victim's bedroom, drawers were pulled out of the dresser, cabinet doors opened, furniture moved, and boxes pulled out of the closet and flipped over. *Id.* at 373, 376, 394. In the living room, a trunk had been opened, and the kitchen and part of the garage had also been ransacked. *Id.* at 385, 424-25. Neither the victim's wallet nor his cash was ever found by the police. N.T., 8/23/22, at 615, 629.

The Commonwealth's evidence established that, at the time of his death, Pitch was separated from his wife and anticipating a divorce. N.T., 8/22/22, at 254, 308, 320[.] Pitch was attempting to borrow money from his employer's 401(k) plan to pay for an attorney, but he was required to pay back an outstanding loan of almost $4,000 before being permitted to withdraw more funds from his plan. N.T., 8/23/22, at 510-12. When Pitch met with his employer's account manager on Tuesday, November 29, 2016, he said he had the cash with him to repay the loan. *Id.* at 512. The account manager advised Pitch to think more about his decision, and they made plans for him to return later that week to take care of the repayment. *Id.* at 514-16. Pitch never kept that appointment. *Id.* at 517.

It was common knowledge in the Welsh Mountain community in Narvon, where Pitch lived, that he carried large amounts of cash on his person, and several witnesses personally observed Pitch in possession of several thousand dollars. N.T., 8/22/22, at 259-60, 294-95, 309, 311. As part of a canvassing of the neighborhood following the murder, Trooper Brian McNally interviewed [Appellant], who lived on Welsh Mountain about a mile from Pitch's residence. N.T., 8/23/22, at 485, 491-93, 661[.] At that voluntary interview on January 2, 2017, [Appellant] told Trooper McNally that he had heard that Pitch had taken a large sum of money from his 401(k) for his divorce. *Id.* at 491, 493.

Acting on the information in December 2016, [Appellant] contacted two friends, Baker and Lyles, both of whom lived just west of Philadelphia. N.T., 8/24/22, at 727, 797, 822[.] [The Commonwealth presented evidence that Appellant, Baker, and

Lyles met each other in prison, and they were members of a prison gang known as the "215 Gang."] Baker and Lyles traveled to Narvon from the Philadelphia area on the evening of December 2, 2016, arriving just before 8:00 p.m. N.T., 8/25/22, at 1001-04, 1009-12. They met up with [Appellant] and were subsequently joined by Bills, who also lived in Narvon. N.T., 8/23/22, at 672.

At trial, co-conspirator Bills testified as an eyewitness to the events that occurred after Baker and Lyles arrived in Narvon the night Pitch was murdered. [Appellant, who Bills referred to as "Florida,"] and Bills were close friends and close neighbors on Narvon Road on Welsh Mountain. N.T., 8/24/22, at 830-32, 875. On the evening of December 2, 2016, [Appellant] pulled up to Bills' home garage in his tan Lincoln MKZ sedan and asked Bills if he needed anything from the gas station as Bills had no car at the time. *Id.* at 833, 879-80[.] Bills said he needed cigarettes, and [Appellant] told Bills to jump in the car. *Id.* at 833. Bills got in behind the driver's seat. *Id.* at 834. Baker was seated in the front seat with [Appellant], and Lyles was seated in the rear right passenger seat—opposite Bills. *Id.* at 834-36. Bills had seen Lyles before at a cookout at [Appellant's] house in the summer of 2016, but had never before seen Baker. [Bills identified Appellant, Baker, and Lyles from photo arrays presented by Trooper Chad Roberts on January 30, 2018, while Bills was incarcerated in Berks County on unrelated charges. *Id.* He also identified Lyles and Baker from a Facebook photo shown to him on February 2, 2018. *Id.*]

Bills testified that the four men took off from Bills' house on Narvon Road heading south. *Id.* at 836. [Appellant] drove to a local [Amish-owned] hardware store where [he], Lyles, and Baker got out of the car, disappeared around the building, and returned quickly after Bills heard a burglar alarm sound. *Id.* at 836-40. [Bills indicated he remained in the car "getting high." *Id.* at 838, 883-84.]

Bills related that the four [men] then [drove away] from the hardware store in [Appellant's] car and drove directly to Dukeman's Sunoco in the Narvon area. [*Id.*] at 841. [Appellant] parked on the east side of the parking lot, exited the vehicle, entered the convenience store, and returned to the vehicle a short time later. *Id.* at 841-43. The other three occupants stayed in the car. *Id.* at 841-42.

Surveillance video from the Sunoco station showed [Appellant] arriving in a light-colored four-door sedan on

December 2, 2016, at 9:23 p.m. [*Id.*] at 935, 942[.] [When he was questioned by the police on February 2, 2018, Bills identified Appellant as the driver of the vehicle in the surveillance video from the Sunoco station. *Id.* at 825. Additionally, Trooper Jonathan Potoka testified that the vehicle in the surveillance video matched the one belonging to Appellant, and the man entering the driver's side of the vehicle was Appellant. N.T., 8/25/22, at 968.] [Appellant] parked the vehicle in the parking lot on the east side of the store. N.T., 8/24/22, at 825. [Appellant] is captured on surveillance entering the store at 9:24 p.m. *Id.* [Appellant] returns to the driver's side of the vehicle at 9:26 p.m. and then drives out of the parking lot. *Id.* The Sunoco surveillance video confirmed this portion of Bills' trial testimony. *See id.* at 783-85.

Bills further testified that the four men subsequently traveled east towards Honey Brook in Chester County to a Turkey Hill convenience store, where [Appellant] parked the car in the parking lot. [*Id.*] at 751-52, 843, 876. [Appellant] and Baker exited the car and went into the store while Bills and Lyles remained in the vehicle. *Id.* at 844. Five minutes later, the pair exited the store, returned to the car, handed Bills a pack of cigarettes and drove out of the parking lot. *Id.* at 844-45. Bills informed [Appellant] at that time that he needed to get home because he had a female friend, Cindy Roop, waiting for him. *Id.* at 845, 881. [Appellant], however, did not immediately return Bills to his home.

It was later that night that [Appellant] pulled his car into the Gospel Tabernacle Church. [*Id.*] at 845-46. [Appellant] parked the car on a back road leading to a cemetery to the rear of the church near some woods located behind Pitch's residence. *Id.* at 773, 816-18, 847-49, 861, 887[.] [The distance between the church and Pitch's home was approximately 100 feet. N.T., 8/22/22, at 429.] When Bills asked what they were doing, [Appellant] told him they planned to "do a lick," meaning they planned to rob someone. N.T., 8/24/22, at 849. All four men exited [Appellant's] vehicle. *Id.* at 849-50. [Appellant] popped the trunk of the car and handed a sawed-off shotgun to Baker and took one for himself. *Id.* at 850-51. [Although Bills informed the police that he was unsure whether Lyles was in possession of a weapon, the evidence established Lyles possessed a handgun since the victim suffered fatal gunshot wounds from small-arms fire and not from shotgun blasts.] [Appellant], Lyles, and Baker put on black gloves and masks and left through the woods with the guns. *Id.* at 851-52. Bills remained near the car. *Id.* at 852.

Approximately ten minutes later, Bills heard gunshots from the direction in which the men had walked. [*Id.*] at 852-53[.] Shortly thereafter, [Appellant], Lyles, and Baker emerged from the woods with Baker and [Appellant] still holding the shotguns. *Id.* at 853-54. After pulling away, [Appellant] told Bills, "It didn't go…as planned." *Id.* at 854.

Surveillance video from the Gospel Tabernacle Church on December 3, 2016, showed a light-colored sedan entering the parking lot at approximately 1:25 a.m. N.T., 8/23/22, at 483-44[.] The vehicle in the church parking lot was the same vehicle [Appellant] was operating at the Sunoco station. N.T., 8/25/22, at 980-81. This same vehicle passes the church security camera again at 1:35 a.m. N.T., 8/24/22, at 934. This surveillance video confirms Bills' trial testimony. *Id.* at 785-86.

Bills further testified that [Appellant] then drove his vehicle away from the church heading south on Narvon Road. [*Id.*] at 856. Bills told [Appellant] at that time that he had to get home. *Id.* at 857. [Appellant] pulled into the driveway of an Amish farm, stopped the vehicle, and shut his car lights off. *Id.* Bills jumped out of the vehicle and ran back to his residence about an eighth of a mile down the road because "[his] mind was a wreck from what [he] heard, and [he] just wanted to get away." *Id.* at 856-57, 873. Bills saw [Appellant] back his vehicle out of the driveway and proceed back in the direction from where he had come— heading north on Narvon Road. *Id.* at 857-58.

Two individuals were present at Bills' residence when he returned: Cindy Roop and Scott Montag. [*Id.*] at 858-59, 888. Scott Montag testified that Bills arrived at the residence on foot, and [he] related that Bills was "visibly shaken up" and "very, very nervous." *Id.* at 909-10.

Later that day, Bills learned of the murder of Dennis Pitch. [*Id.*] at 860. It was at that point Bills made the connection between the location of Pitch's home to the church parking lot and the sound of gunshots. *Id.* at 861-82. Bills, however, did not go to the police at that time out of fear of what might happen to his family if he turned in the others. *Id.* at 862.

Bills [was] eventually arrested and incarcerated on unrelated charges in Berks County in January of 2018. [*Id.*] at 863. Ten days after his arrest, [after waiving his *Miranda*[3]

---

[3] *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

rights,] Bills gave a…statement to the police implicating himself and his three co-conspirators - [Appellant], Baker, and Lyles – in the murder of Dennis Pitch. *Id.* at 863-68[.] The police made no promises or other inducements to encourage Bills to give this statement; Bills provided it voluntarily. *Id.* at 743, 750.

Over the course of the 16-month investigation into the death of Dennis Pitch, [Appellant] met voluntarily with the police on three separate occasions: January 2, 2017, February 21, 2017, and August 4, 2017. During the initial meeting on January 2, 2017, as part of a neighborhood canvassing, [Appellant] told Trooper McNally that he had heard that Pitch had taken a large sum of money from his 401(k) and that a Pagan gang member, Ralph "Corby" Trego, had recently come into some money and had purchased an Infinity luxury car. N.T., 8/23/22, at 491-94. [Appellant] further informed the police that Dennis Pitch and his brother, Darren, were small-time drug dealers in the Welsh Mountain area. *Id.* at 494.

As part of their continuing investigation, the police had analyzed and cross-referenced cell tower data with known cell phone numbers and developed two numbers of particular interest. [*Id.*] at 662-63. The known subscriber for one Philadelphia number was [Appellant]. *Id.* at 664. The police did not know the subscriber for the other number of interest from Delaware[.] *Id.* at 663. On the night of the homicide, there were numerous calls and texts between [Appellant's] number and the Delaware number. *Id.* at 665-66, 670. At this stage of the investigation, the police had developed Bills as a person of interest. *Id.* at 666. Bills had relatives in Delaware, so they suspected the number belonged to him. *Id.* at 667. On February 21, 2017, Trooper Potoka re-interviewed [Appellant] in an effort to identify the subscriber of the Delaware cell number. *Id.*

In the initial part of the recorded interview, [Appellant] repeatedly denied knowing Dennis Pitch and denied ever being at his home. *Id.* at 669. He continued to implicate "Corby" Trego in the murder and suggested it could have been the boyfriend of Pitch's estranged wife. *Id.* Trooper Potoka then asked [Appellant] to dial the Delaware number…on his phone and, when he did, the name "Billions" came up as the contact. *Id.* [Appellant] told the Trooper that this number belonged to Bills and that his mother lives in Delaware, which accounts for the Delaware area code. *Id.* at 670.

- 9 -

Further police investigation in the ensuing months determined that the Delaware number did not, in fact, belong to Bills as stated by [Appellant]. [*Id.*] at 673. Rather, it belonged to an Eileen Frame, whose son is co-conspirator Michael Baker. *Id.* Thus, in their third interview of August 4, 2017, Trooper Potoka and Trooper Todd McCurdy confronted [Appellant] with information indicating that "Billions" was not Bills, as [Appellant] had told them. *Id.* at 676. [Appellant] revealed that "Billions" is actually Baker, a friend from the Philadelphia area. *Id.* He denied trying to intentionally mislead the police and stated the misinformation was simply a mistake. *Id.* [Appellant] told the Troopers that Baker had never been in the Narvon area. *Id.* They confronted [Appellant] with cell phone evidence that the number corresponding to "Billions" had connected with [Appellant's] phone in the hours before the homicide and that Baker's cell phone was in Narvon on the night of the killing. *Id.* [Appellant] specifically denied ever seeing Baker in Narvon and continued to generally deny involvement in, or knowledge of, the homicide. *Id.*

[Appellant] was subpoenaed to testify before the grand jury in November of 2018. N.T., 8/24/22, at 684. [At trial, with the use of the transcript from this prior legal proceeding, and during the direct examination of Trooper Potoka, the Commonwealth introduced into evidence statements Appellant made during the grand jury hearing.] [Specifically,] [d]uring [his grand jury] testimony, [Appellant] denied knowing Pitch, denied ever being at his home, and denied knowing anything about him. *Id.* at 686, 688, 719-20, 729. [Appellant] stated that people on the Mountain were saying Brandon Bills had something to do with the murder. *Id.* at 696. [Appellant] admitted texting and calling Baker from 6:24 p.m. on the evening of December 2, 2016, [to] 7:20 a.m. the morning of December 3, 2016. *Id.* at 698-700, 703. [Appellant] explained the two were communicating about Baker's car, which was experiencing computer problems. *Id.* at 699-700. [Appellant] acknowledged that one of Baker's nicknames is "Billions." *Id.* at 702. [Appellant] denied knowing that, while he was texting Baker about his car not working, Baker was in Narvon. *Id.* at 702-03, 717-18. [Appellant] testified that Bills told him he was at his mother's home in Delaware at the time of the murder, and he didn't have anything to do with it. *Id.* at 716.

[Appellant] admitted knowing Christopher "Suse" Lyles, a friend from the Philadelphia area, and having him to his home in Narvon. [*Id.*] at 722-25, 728, 730. Although he could not specifically recall, [Appellant said] that it was possible that he and

- 10 -

Baker were both communicating with Lyles the night Pitch was murdered. *Id.* at 731. They were all friends, and despite having previously told the police that Baker had never been in Lancaster, [Appellant] admitted that the three of them had spent time together in Lancaster County. *Id.* at 720-25.

The Commonwealth introduced substantial expert evidence regarding the cell phone records of the co-conspirators to establish their conspiracy. N.T., 8/25/22, at 987-1014[.] [Specifically, the Commonwealth offered the expert testimony of Detective Anthony Vega of the Philadelphia Police Department, who is assigned to the Federal Bureau of Investigation's cellular analysis survey team.] [Detective Vega indicated] [t]he historical cell site data for Baker's phone established that his phone left the Philadelphia area at approximately 5:43 p.m. on December 2, 2016, passed through the New Holland, Lancaster County area at approximately 6:56 p.m., and was in Narvon by at least 8:36 p.m. on December 2, 2016. *Id.* at 1003-04. The data was able to establish cell phone activity between [Appellant] and Baker from 6:25 p.m. on December 2, 2016, through 7:02 a.m. on December 3, 2016. *Id.* Most importantly, the data mapping proved the presence of Baker's cell phone in Narvon on the night of the murder. *Id.* at 1003-05[.] Baker's cell phone records established that he returned to the Philadelphia area at approximately 3:29 a.m. on December 3, 2016. *Id.* at 1006.

The cellular data for Lyles' phone established that his phone left the Philadelphia area at 5:46 p.m. and arrived in Narvon at 7:37 p.m. on the evening of December 2, 2016. [*Id.*] at 1009. During this time, there were numerous cellular contacts with [Appellant's] cell phone. *Id.* at 1010. The data shows Lyles' phone's location near the commercial burglary site, as well as the homicide site. *Id.* at 1012. Lyles' last connection in the Narvon area was at 2:20 a.m. on December 3, 2016, and then the phone traveled back toward Philadelphia arriving there at approximately 3:56 a.m. *Id.* at 1013-14.

[Appellant's] cell phone data established activity with Baker's and Lyles' phones between 5:49 p.m. and 9:56 p.m. on December 2, 2016. [*Id.*] at 1007-08. There was no cellular activity between these three phones between 9:56 p.m. on December 2, 2016, and 8:19 a.m. on December 3, 2016. *Id.* at 1005-06[.]

Finally,…Trooper Potoka [testified] that the vehicle depicted in the surveillance video from [the] Gospel Tabernacle Church was

- 11 -

[Appellant's] Lincoln. [*Id.*] at 980. Trooper Potoka further testified that, in his opinion, the vehicle shown in the surveillance video from Dukeman's Sunoco was also [Appellant's vehicle] and that the person who is observed exiting the vehicle, going into the convenience store, and re-entering the driver's side of the vehicle was [Appellant]. *Id.* at 981.

[Appellant] did not exercise his right to take the stand after a thorough on-the-record colloquy. [*Id.*] at 1024-26. [Appellant did not] present any evidence [at trial]. *Id.* at 1029.

Trial Court Opinion, filed 8/8/23, at 6-19 (footnotes omitted) (footnote added).

At the conclusion of all evidence, the jury convicted Appellant of the offenses indicated *supra*, and on December 9, 2022, the trial court sentenced Appellant to an aggregate of life in prison without parole. Appellant filed a timely, counseled post-sentence motion challenging the sufficiency and weight of the evidence supporting his convictions. On March 22, 2023, the trial court denied Appellant's post-sentence motion, and this timely, counseled appeal followed on April 21, 2023. All Pa.R.A.P. 1925 requirements have been met.

On appeal, Appellant sets forth the following issue in his "Statement of the Questions Involved" (verbatim):

A. Whether the Honorable Trial Court erred by denying Appellant's post-sentence motion for a new trial, when the jury returned a verdict of guilty on the charge of first-degree murder, that was against the weight of the evidence and insufficient as a matter of law.

Appellant's Brief at 4 (unnecessary capitalization and suggested answer omitted).

Initially, we note Appellant conflates the issues of sufficiency and weight of the evidence. We remind Appellant that sufficiency and weight claims are clearly distinct. *See Commonwealth v. Widmer*, 560 Pa. 308, 744 A.2d 745 (2000) (discussing the distinctions between a claim challenging sufficiency of the evidence and a claim the verdict is against weight of the evidence). "A true weight of the evidence challenge concedes that sufficient evidence exists to sustain the verdict but questions which evidence is to be believed." *Commonwealth v. Charlton*, 902 A.2d 554, 561 (Pa.Super. 2006) (quotation omitted). With these legal precepts in mind, we turn first to an examination of whether the evidence was sufficient to support Appellant's conviction for one count of first-degree murder.[4]

Appellant contends the Commonwealth failed to present sufficient evidence "tending to show [Appellant] himself branded the gun that killed the victim" or "that Appellant had the specific intent to kill the victim as required for a conviction of first-degree murder." Appellant's Brief at 9-10, 17 (emphasis omitted). Appellant contends he had, at most, the intent to rob the victim, and the fact one of his cohorts killed the victim does not establish Appellant's guilt for first-degree murder.

---

[4] We note Appellant has neither raised nor developed an argument on appeal challenging the sufficiency of the evidence as to his remaining convictions. Appellant preserved his sufficiency claim in his court-ordered Rule 1925(b) statement. *See* Pa.R.A.P. 1925(b).

- 13 -

We note this Court's standard of review when considering a challenge to the sufficiency of the evidence requires us to look at the evidence in a light most favorable to the Commonwealth, as verdict winner, and determine whether the evidence presented, actual and/or circumstantial, was sufficient to enable a fact-finder to find every element of the crime charged, beyond a reasonable doubt. **See Commonwealth v. O'Brien**, 939 A.2d 912 (Pa.Super. 2007).

> In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and the circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances.

**Id.** at 913–914 (quotation omitted). The jury, as the finder of fact, is free to believe all, some, or none of the evidence presented and is free to determine the credibility of the witnesses. **Commonwealth v. Dailey**, 828 A.2d 356 (Pa.Super. 2003). In conducting review, the appellate court may not weigh the evidence and substitute its judgment for the fact-finder. **Commonwealth v. Baumgartner**, 206 A.3d 11, 14-15 (Pa.Super. 2019).

Section 306 of the Crimes Code defines accomplice liability as follows:

**(a) General rule.—**A person is guilty of an offense if it is committed by his own conduct or by the conduct of another person for which he is legally accountable, or both.

**(b) Conduct of another.—**A person is legally accountable for the conduct of another person when:

- 14 -

(1) acting with the kind of culpability that is sufficient for the commission of the offense, he causes an innocent or irresponsible person to engage in such conduct;

(2) he is made accountable for the conduct of such other person by this title or by the law defining the offense; or

(3) he is an accomplice of such other person in the commission of the offense.

**(c) Accomplice defined.**—A person is an accomplice of another person in the commission of an offense if:

(1) with the intent of promoting or facilitating the commission of the offense, he:

(i) solicits such other person to commit it; or

(ii) aids or agrees or attempts to aid such other person in planning or committing it; or

(2) his conduct is expressly declared by law to establish his complicity.

**(d) Culpability of accomplice.**—When causing a particular result is an element of an offense, an accomplice in the conduct causing such result is an accomplice in the commission of that offense, if he acts with the kind of culpability, if any, with respect to that result that is sufficient for the commission of the offense.

18 Pa.C.S.A. § 306 (bold in original).

Thus, proving a defendant's guilt as an accomplice requires the satisfaction of a two-prong test: (1) there must be evidence to show that the defendant "intended to facilitate or promote the underlying offense" and (2) there must be evidence that the defendant "actively participated in the crime or crimes by soliciting, aiding, or agreeing to aid the principal[.]" *Commonwealth v. Kimbrough*, 872 A.2d 1244, 1251 (Pa.Super. 2005) (*en banc*) (citations omitted). "Both requirements may be established wholly by circumstantial evidence. Only the least degree of concert or collusion in the

- 15 -

commission of the offense is sufficient to sustain a finding of responsibility as an accomplice. No agreement is required, only aid." *Id.* (internal citations and quotation omitted). Accordingly, where the evidence reveals a defendant acted as an accomplice, the defendant is criminally responsible for the acts committed by himself, as well as his accomplices. *See* 18 Pa.C.S.A. § 306(a), (b)(3).

Regarding first-degree murder, "a criminal homicide constitutes murder of the first degree when it is committed by an intentional killing." 18 Pa.C.S.A. § 2502(a).

As our Supreme Court has held:

There are three elements of first-degree murder: (i) a human being was unlawfully killed; (2) the defendant was responsible for the killing; and (3) the defendant acted with malice and a specific intent to kill. 18 Pa.C.S. § 2502(a); *Commonwealth v. Houser*, 610 Pa. 264, 18 A.3d 1128, 1133 (2011). As set forth in the third element, first-degree murder is an intentional killing, *i.e.*, a "willful, deliberate and premeditated killing." 18 Pa.C.S. § 2502(a) and (d). "Premeditation and deliberation exist whenever the assailant possesses the conscious purpose to bring about death." *Commonwealth v. Drumheller*, 570 Pa. 117, 808 A.2d 893, 910 (2002). The law does not require a lengthy period of premeditation; indeed, the design to kill can be formulated in a fraction of a second. *Commonwealth v. Earnest*, 342 Pa. 544, 21 A.2d 38, 40 (1941) ("Whether the intention to kill and the killing, that is, the premeditation and the fatal act, were within a brief space of time or a long space of time is immaterial if the killing was in fact intentional, willful, deliberate and premeditated."). Specific intent to kill as well as malice can be inferred from the use of a deadly weapon upon a vital part of the victim's body. Whether the accused had formed the specific intent to kill is a question of fact to be determined by the jury.

***Commonwealth v. Jordan***, 619 Pa. 513, 65 A.3d 318, 323 (2013) (some citations omitted).

In ***Commonwealth v. Rios***, 554 Pa. 419, 721 A.2d 1049 (1998), our Supreme Court explained accomplice liability in the context of first-degree murder as follows:

> It is well established that an accomplice is equally criminally liable for the acts of another if he acts with the intent of promoting or facilitating the commission of an offense and agrees, aids, or attempts to aid such other person in either planning or committing that offense. In order to sustain a conviction for first-degree murder via accomplice liability, the Commonwealth's evidence must be sufficient to establish that appellant possessed specific intent to kill. Whether an accomplice possessed the same intent to kill as his co-conspirator may be inferred from words, conduct, the attendant circumstances including the actions taken after the killing and all reasonable inferences that follow from them.

***Rios***, ***supra***, 721 A.2d at 1053 (citations omitted).

Here, assuming, *arguendo*, the record reveals Lyles and/or Baker shot the victim, and Appellant did not do so, we conclude the evidence is sufficient to establish Appellant is criminally liable for first-degree murder under accomplice liability. Viewed in the light most favorable to the Commonwealth, as verdict winner, the evidence reveals that, during the early evening of December 2, 2016, Appellant contacted Lyles and Baker, both of whom Appellant knew from his previous time in prison. Lyles and Baker traveled to Narvon, where the victim, as well as Appellant and Bills lived. With Lyles, Baker, and Bills in his vehicle, Appellant drove to several locations where one

or more of the men burglarized an Amish-owned business during the evening of December 2, 2016.

Later that night, Appellant parked his vehicle at a church near some woods by the victim's residence. Appellant removed two sawed-off shotguns from the trunk of his car. He handed one to Baker and took one for himself. Appellant, Baker, and Lyles put on gloves and masks, and they then went to the victim's house where a violent struggle ensued. Specifically, while working as a team, the men gained access to the victim's home, beat him, and ransacked his house looking for money. A shotgun was fired at least once during the home invasion and resulted in a hole in the floor of the victim's bedroom. Moreover, during the struggle, while the victim was on his knees or lying on the floor, he was shot four times from behind. "The victim was shot through the back of his head, also through his right check into his chest, through the back of the right upper arm into the chest, and finally through the right upper back into the chest and through the right lung." Trial Court Opinion, filed 8/8/23, at 26 (citations to record omitted). The four shots were from a handgun, which the Commonwealth argued was possessed by Lyles. The trio then ran from the victim's house, entered Appellant's car where Bills was still waiting, and left the scene. *See Commonwealth v. Housman*, 604 Pa. 596, 986 A.2d 822 (2009) (indicating flight can constitute circumstantial evidence of consciousness of guilt).

Based on the aforementioned, the Commonwealth proved beyond a reasonable doubt that Appellant was guilty of first-degree murder under accomplice liability. Although circumstantial, the evidence proves Appellant intended to facilitate or promote first-degree murder, and he actively participated in the crime by soliciting, aiding, or agreeing to aid Baker and Lyles. **Kimbrough**, **supra**. Even if Appellant did not shoot a vital body part of the victim or personally fire any shots, the jury could have properly found Appellant had the requisite specific intent to kill based on his accomplice's use of a deadly weapon on a vital part of the victim's body. Moreover, the victim suffered four gunshot wounds, and the sheer number of bullets fired at the victim allows the jury an inference that Appellant had the specific intent to kill. Simply put, contrary to Appellant's assertion, the Commonwealth was not required to prove Appellant was the person who shot the victim. Rather, since Appellant acted as an accomplice to Lyles and Baker, and the evidence demonstrates he had the same intent to kill as his accomplices, he is criminally responsible for the acts committed by one or both of them. **See Rios**, **supra**.

Moreover, Appellant suggests that he cannot be guilty of first-degree murder because, when the men entered the victim's home, they only had the specific intent to commit a burglary, and not murder the victim. Even assuming, *arguendo*, Appellant's version of events is supported by the evidence, we note the "law does not require a lengthy period of premeditation; indeed, the design to kill can be formulated in a fraction of a second." **Rios**,

*supra*, 721 A.2d at 1053 (citations omitted). Here, the Commonwealth proved the victim fought back during the home invasion, and he was severely beaten. Also, several gunshots were fired, including one from a shotgun and several from a handgun, which missed the victim, as well as four shots from a handgun, which entered the victim's body from behind as the victim knelt and/or was lying on the floor. Accordingly, even if Appellant and his accomplices did not have the specific intent to kill the victim when they entered the victim's home, the Commonwealth sufficiently demonstrated that, at some point during the home invasion, Appellant and his accomplices formed the specific intent to kill the victim. **Rios**, *supra*, 721 A.2d at 1053 ("Whether an accomplice possessed the same intent to kill as his co-conspirator may be inferred from words, conduct, the attendant circumstances including the actions taken after the killing and all reasonable inferences that follow from them.") (citations omitted)). Accordingly, we find no merit to Appellant's sufficiency of the evidence claim.

Appellant also contends the jury's verdict for first-degree murder is against the weight of the evidence.[5] Specifically, Appellant notes his co-conspirators, Lyles and Baker, were convicted of second-degree murder in

_____

[5] Appellant adequately preserved his weight claim in his post-sentence motion, as well as his court-ordered Pa.R.A.P. 1925(b) statement. **See** Pa.R.Crim.P. 607; Pa.R.A.P. 1925(b). Appellant has neither raised nor developed an argument on appeal challenging the weight of the evidence as to his remaining convictions.

separate trials, and, thus, the jury's verdict of first-degree murder in Appellant's trial is wholly inconsistent and shocks one's sense of justice.

When considering challenges to the weight of the evidence, we apply the following precepts. "The weight of the evidence is exclusively for the finder of fact, who is free to believe all, none[,] or some of the evidence and to determine the credibility of the witnesses." ***Commonwealth v. Talbert***, 129 A.3d 536, 545 (Pa.Super. 2015) (quotation marks and quotation omitted). Resolving contradictory testimony and questions of credibility are matters for the finder of fact. ***Commonwealth v. Hopkins***, 747 A.2d 910, 917 (Pa.Super. 2000). It is well-settled that we cannot substitute our judgment for that of the trier of fact. ***Talbert***, ***supra***.

Moreover, appellate review of a weight claim is a review of the trial court's exercise of discretion in denying the weight challenge raised in the post-sentence motion; this Court does not review the underlying question of whether the verdict is against the weight of the evidence. ***See id.***

> Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

***Id.*** at 546 (quotation omitted). Furthermore, "[i]n order for a defendant to prevail on a challenge to the weight of the evidence, the evidence must be so

tenuous, vague and uncertain that the verdict shocks the conscience of the court." *Id.* (quotation marks and quotation omitted).

Our Supreme Court has held that inconsistent verdicts between co-conspirators is not a basis for a new trial. *See Commonwealth v. Miller*, 613 Pa. 584, 35 A.3d 1206, 1213 (2012) ("[E]ven where two verdicts are logically inconsistent, such inconsistency alone cannot be grounds for a new trial or for reversal."); *Commonwealth v. Campbell*, 539 Pa. 212, 651 A.2d 1096 (1994) (holding even where co-defendants are tried together inconsistent verdicts alone is not grounds for a new trial).

Here, in addressing Appellant's claim, the trial court noted that any inconsistency in the verdicts in Appellant's, Lyles', and Baker's cases is not a basis for a new trial given that the evidence was sufficient to support Appellant's first-degree murder conviction in the instant case. *See* Trial Court Opinion, filed 8/8/23, at 30. As the trial court suggested, "we refuse to inquire or speculate upon the nature of the jury's deliberations or the rationale behind the jury's decision." *Campbell*, *supra*, 651 A.2d at 1100–01. In the case *sub judice*, the jury properly weighed the evidence presented at Appellant's trial, as detailed above, and found it sufficient to prove Appellant's guilt of first-degree murder beyond a reasonable doubt. In light of the foregoing, the trial court did not err in concluding the verdict was not so contrary to the weight of the evidence as to shock one's sense of justice. *See Talbert*, *supra*.

For all of the foregoing reasons, we affirm.

Affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 3/21/2024